Gerald Ross PIZZUTO, Jr.,
Petitioner–Appellant,

v.

A.J. ARAVE, Warden, Respondent–
Appellee.

No. 97–99017.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 24, 2001.

Filed Feb. 6, 2002.

Robert H. Gombiner, Assistant Federal Public Defender, Tacoma, WA, for the petitioner-appellant.

L. LaMont Anderson, Deputy Attorney General, Boise, ID, for the respondent-appellee.

Before B. FLETCHER, RYMER, and GOULD, Circuit Judges.

OPINION

RYMER, Circuit Judge.

Idaho state prisoner Gerald Ross Pizzuto, Jr. appeals the district court's dismissal of his 28 U.S.C. § 2254 habeas petition, in which he challenges his 1986 conviction and sentence for the first degree murders of Berta Herndon and her nephew, Delbert Herndon. Pizzuto was sentenced to death.

Because Pizzuto filed his habeas petition before the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, AEDPA does not apply to the merits of his appeal. However, on April 26, 2000, the Supreme Court held in *Slack v. McDaniel*, 529 U.S. 473, 482, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), that the procedural requirements of AEDPA govern any habeas petitioner's appeal commenced after the statute's effective date, April 24, 1996, regardless of when the petition was filed. Consequently, Pizzuto needs a certificate of appealability (COA) rather than a certificate of probable cause (CPC) for this court to have jurisdiction. As Pizzuto could not have known that a COA rather than a CPC was required, we treat "the petitioner's notice of appeal as a request for a COA on the issues raised in the briefs, and we grant a COA on those issues as to which the petitioner has made the requisite 'substantial showing of the denial of a constitutional right.'" *Morris v. Woodford*, 229 F.3d 775, 779 (9th Cir.2000) (quoting *Schell v. Witek*, 218 F.3d 1017, 1021 n. 4 (9th Cir.2000)). We conclude that Pizzuto has made such a showing and so grant a COA on the issues raised in his briefs.

On the merits, we affirm.

## I

On July 25, 1985, Berta Herndon and her adult nephew Delbert Herndon were robbed and murdered and their property was stolen while they were camping in the Ruby Meadows area, a remote campsite near McCall, Idaho. The police discovered their bodies in shallow graves that had been dug near their cabin. The victims' hands were bound behind their backs with shoelaces and heavy wire, and Berta's and Delbert's jeans were pulled below their knees. The murders occurred in the Herndon cabin.

Both the Idaho Supreme Court and the district court's order denying Pizzuto's petition for writ of habeas corpus describe the facts in detail. In sum, testimony at trial showed that Pizzuto, James Rice, and William and Lene Odom knew each other from Orland, California. They (along with the Odoms' two children) traveled to Idaho in the Odoms' vehicle, and were camping together that day in a cabin in the Ruby Meadows area. William Odom and Pizzuto discussed robbing two fishermen, Stephen Crawford and Jack Roberts. While they were at the pond, the Herndons drove by in their pickup truck. Pizzuto and Odom abandoned their plan to rob the fishermen, and returned to their cabin. Shortly thereafter, Pizzuto left the others and walked off in the direction the Herndons had driven. He picked up a .22 caliber rifle and said he was going "hunting."

Twenty to thirty minutes later, Rice and Odom drove up the road in Odom's truck looking for Pizzuto. As they drove past the Herndon cabin, they saw Pizzuto standing in the doorway, holding a revolver. Pizzuto came up to Rice and Odom and told them to "give me half an hour and then come back up." Rice and Odom drove back to their cabin, left their truck, and walked back to the Herndon cabin.

Approaching the Herndon cabin, Rice and Odom heard "bashing hollow sounds" like a watermelon being thumped. Pizzuto emerged with a hammer, the rifle, a revolver, and a pair of cowboy boots. He also had a "wad of hundred dollar bills" that he gave to Odom; Rice took the rifle. Pizzuto told them that he had "put those people to sleep, permanently." He also said that he told the Herndons that he was a "highwayman" and that, when Delbert Herndon didn't believe him, Pizzuto put a gun up to Delbert's face, "made him drop his pants and crawl around the cabin," and asked Delbert: "Does this look like a cannon from where you are standing at?"

Rice then heard some snoring sounds coming from the cabin and went inside. There, he found Berta and Delbert lying on the ground, with blood on their heads. Both bodies were still, except for Delbert Herndon's legs which were shaking. Rice shot Delbert Herndon in the head because he "didn't want him to suffer."

Pizzuto, Rice, and Odom returned to their camp, divided up the money Pizzuto had stolen from the Herndons, and gave Lene Odom a leftover $100 bill. Pizzuto and Odom then went back to the Herndon cabin to bury the bodies. At the cabin, Odom saw that the Herndons' hands were tied behind their backs. They buried Berta Herndon in a hole that Rice had previously dug. Pizzuto and Odom got Rice to help them bury Delbert Herndon; they threw his body in a shallow ditch and covered it with dirt.

After they returned to their cabin, Pizzuto, the Odoms, and Rice sorted through the Herndons' possessions and took what they wanted. They left Ruby Meadows with Odom driving his truck and Pizzuto and Rice riding in the Herndon truck. They camped that evening at a nearby hot springs; the next morning they parked the Herndon truck in a wooded area, drove

into Cascade and checked into a motel. They stayed there for several days and, while there, took pictures of each other with a camera stolen from the Herndons. Rice then took a bus to Orland, where he reported the murders to the police.

On July 31, Pizzuto met Roger Bacon in Gold Fork Hot Springs. Bacon and Pizzuto decided to go fishing and hunting. As they walked toward a small stream, Pizzuto pulled out a gun and said "he was a highwayman." Pizzuto tied Bacon's hands behind his head with shoelaces, took money from him, and left him tied to a tree. Bacon eventually freed himself.

Sometime in early August Pizzuto visited his sister, Angelinna Pizzuto, in Great Falls, Montana. Pizzuto arrived with cowboy boots, a revolver, and a two-tone gold wedding band in his possession, all of which were subsequently identified as belonging to Delbert Herndon. Pizzuto told her that he was a "highwayman" and that he had robbed and murdered a man and a woman (with the man's gun, which he had) after he had tied them to some trees. Later, Pizzuto told his sister that he had not killed the man but Rice had; later still, that Rice and Odom had killed the people and he, Pizzuto, had freaked out, had a seizure, and tied a guy to a tree.

Autopsies revealed that Berta Herndon and Delbert Herndon each suffered two fatal blows to the head, consistent with hammer blows, and in addition that Delbert Herndon had been shot between the eyes which would also be fatal. The pathologist was unable to determine which occurred first. Delbert Herndon's wrists had been bound with a shoe lace and a piece of wire, and Berta Herndon's hands and wrists were tied behind her back using a shoe lace which was wrapped several times around her right thumb.

Pizzuto, Rice and the Odoms were charged with the Herndon murders; Rice

and Odom pled guilty to lesser offenses and charges against Lene Odom were dismissed in exchange for their agreeing to testify at Pizzuto's trial.

Following a jury trial Pizzuto was convicted of two counts of murder in the first degree, two counts of felony murder, one count of robbery, and one count of grand theft on March 27, 1986. The trial judge, Hon. George C. Reinhardt, ordered that a presentence report be completed and that psychiatric examinations be conducted by Dr. Michael Emery and Dr. Roger White. Pizzuto declined to meet with Dr. White on advice of counsel. During the sentencing hearing before Judge Reinhardt, convened May 21, 1986, Pizzuto called his two sisters, Toni and Angelinna Pizzuto, and his aunt, Kibby Winslow, who described the abuse he (and his sisters) suffered in childhood; his former probation officer from Great Falls, Montana, Jerome Skiba, who gave a positive report on Pizzuto's adjustment; and Dr. Emery. Pizzuto did not testify but made an unsworn statement to the court. The state presented eight witnesses, including Pizzuto's former wife, 1822 Pamela Relken, who testified that Pizzuto could be "very violent, punishing" in that he had pushed her head into a wall, drowned her cats and their puppy (who Pizzuto then hung from the shower stall), pushed her down the stairs when she was six-and-a-half months pregnant, pointed a gun at her head and played roulette, described himself "as a fourth generation Al Capone," and threatened her with death in a letter written after he had been arrested on rape charges. It also called Michael Berro, the presentence investigator on Pizzuto's Michigan rape conviction, who testified that Pizzuto was "one of two people who have ever threatened [his] life where [he] believed it"; Paul Blumbaum, who worked at Pizzuto's jail and testified that Pizzuto claimed to have put snakes in mail-

boxes, said that he could "get anything out of anybody he wanted by the technique of tying them tightly around the ankles," and threatened his jailers by saying that he was going to bring in the Mafia; Annette Jones, who authored the presentence report for the Herndon case; Berta Herndon's widower; and Dr. Emery.

On May 23, 1986 Judge Reinhardt sentenced Pizzuto to a fourteen-year fixed term with no possibility of parole for grand theft and a fixed life term for robbery. On the murder charges, the judge found that the mitigating circumstances did not outweigh any one of five statutory aggravating circumstances as would make imposition of the death penalty unjust. Accordingly, he sentenced Pizzuto to death for the murders of Delbert Herndon and Berta Herndon.

Pizzuto filed a petition for post-conviction relief. After holding an evidentiary hearing, the state district court dismissed the petition on April 15, 1988. Pizzuto appealed his convictions and denial of the motion for post-conviction relief to the Idaho Supreme Court, which affirmed. *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991) (*Pizzuto I* ).

On June 22, 1992 Pizzuto filed a motion in the federal district court seeking appointment of counsel and a stay of execution, which was granted. He filed a petition for writ of habeas corpus on September 18, 1992, and a first amended petition on January 29, 1993. Meanwhile, Pizzuto filed a second petition for post-conviction relief and moved to disqualify

the trial judge. The state district court held that the claims were ones of which Pizzuto had knowledge that should have been brought in his first post-conviction petition, and denied the motion to disqualify as moot. It dismissed the second petition under Idaho Code § 19–2719, and the Idaho Supreme Court again affirmed. *Pizzuto v. State*, 127 Idaho 469, 903 P.2d 58 (1995) (*Pizzuto II* ).

The federal district court denied Pizzuto's habeas petition April 7, 1997. Pizzuto moved to alter or amend the judgment, which the court also denied on June 9. The district court granted a CPC on July 10.[1]

II

Pizzuto contends that his trial counsel, Nick Chenoweth and Scott Wayman, were ineffective at sentencing in a number of respects. To prevail under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Pizzuto must demonstrate that his "counsel's performance was deficient" *and* "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Performance is measured "as of the time of counsel's conduct," *id.* at 690, 104 S.Ct. 2052, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101,

1. On December 12, 1997, and February 24, 1998, Pizzuto sought to enlarge the record on appeal, and on November 29, 2000, he moved for a remand to amend his petition for writ of habeas corpus to supplement his ineffective assistance of counsel claims and to add a *Brady* claim. He exhausted these claims in his third amended petition for post-conviction relief in the state court, which was filed on April 13, 1998, and ultimately denied on September 6, 2000. *Pizzuto v. State*, 134 Idaho 793, 10 P.3d 742 (Idaho 2000) (*Pizzuto III* ). We denied Pizzuto's motions to remand and enlarge the record on January 25, 2001. Pizzuto has since sought permission to file a second or successive petition for writ of habeas corpus under 28 U.S.C. § 2244(b)(3)(A), which we deny in a separate order.

76 S.Ct. 158, 100 L.Ed. 83 (1955)). Because Pizzuto must prove both deficient performance and prejudice, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697, 104 S.Ct. 2052.

A petitioner must "affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. 2052. This requires showing more than the possibility that he was prejudiced by counsels' errors. Rather, he must demonstrate that the errors *actually* prejudiced him. *See id.* Under *Strickland,* actual prejudice occurs where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Whether an error actually prejudiced a defendant is weighed against the "totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. 2052. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. 2052; *see also Bragg v. Galaza,* 242 F.3d 1082, 1088 (9th Cir. 2001) (holding that "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case"), 798 F.2d 374, 376 (9th Cir.1986) (quoting *Eggleston v. United States* ).

A

*Contesting Aggravating Circumstances*

Pizzuto argues that counsel made no effort to contest the aggravating circumstances alleged by the state either through evidence or argument. In particular, he submits that counsel should have pointed out the weakness in the theory that Pizzuto alone tied up the Herndons; should have emphasized inconsistencies between the testimony of Rice and Odom about whether Rice said he wanted to have sex with Berta Herndon, whether Odom made Rice "dance" by pointing a gun at his feet, whether Rice volunteered to dig the graves, and whether Odom suggested that they jump a gold miner's claim before the robbery and murder took place; and should have argued that it was the presence of Rice and Odom which transformed the Herndon robbery into murder because Pizzuto by himself only robbed Bacon but did not harm him. Individually or cumulatively, we do not see how these arguments would have made a difference.

Under Idaho law at the time of Pizzuto's sentencing, the judge alone determines whether at least one of ten statutory aggravating circumstances has been established beyond a reasonable doubt. Idaho Code § 19–2515.[2] Once an aggravating

---

**2.** The ten statutory aggravating factors are:
(1) The defendant was previously convicted of another murder;
(2) At the time the murder was committed the defendant also committed another murder;
(3) The defendant knowingly created a great risk of death to many persons;
(4) The murder was committed for remuneration or the promise of remuneration....;

(5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity;
(6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life;
(7) The murder was one defined as murder of the first degree by section 18–4003, Idaho Code, subsections (b), (c), (d), (e), or (f), and it was accompanied with the

circumstance is found true, the court "shall" sentence the defendant to death "unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make the imposition of death unjust." *Id.* at § 19–2515(c). Both parties have the right at sentencing to present "all relevant evidence in aggravation and mitigation," but "[e]vidence admitted at trial shall be considered and need not be repeated at the sentencing hearing." *Id.* at § 19–2515(d).

■ Here, the state district judge who sentenced Pizzuto also presided over the guilt phase, and made it clear that evidence adduced at trial would be considered at sentencing. His findings specifically note that he had considered "all of the evidence admitted during the trial...." Therefore, counsels' effectiveness cannot be measured solely by what they did or didn't do at the sentencing phase. *See Woratzeck v. Stewart,* 97 F.3d 329, 336–37 (9th Cir.1996) (no ineffective assistance of counsel for failing to present evidence when evidence was already in the record); *Williams v. Calderon,* 52 F.3d 1465, 1471 (9th Cir.1995) (prejudice not shown where trial counsel introduced no mitigating evidence at penalty phase but had presented that evidence during the guilt phase).

■ Every weakness or discrepancy that Pizzuto now says should have been cited and argued at sentencing was already before the court. At trial, counsel impeached Rice and Odom with their prior convictions, lesser sentences, and drinking and drug use; they portrayed Lene Odom as a cold hearted criminal who "rifled" through the Herndons' belongings, demanded her share of the loot and escaped prosecution in exchange for her testimony. Counsel meticulously cross-examined Rice, Odom and Lene Odom and argued that they were liars who had "concoct[ed] a story" but "forgot the details." In closing argument, Chenoweth highlighted inconsistencies in their testimony by noting that Lene Odom said she and Odom had strips of beef and fries in McCall and that no one else ate, while Rice testified that they bought a dozen hamburgers but that he couldn't eat them; that Lene Odom claimed her husband never discussed the murders, while Odom stated he told her that people had been killed; that Rice saw Pizzuto exit the Herndon cabin wearing cowboy boots, while Odom saw him carrying them; that Rice saw Pizzuto carrying a claw hammer, while Odom saw a ball-peen one; that Rice heard four "thunks" from the Herndon cabin, while Odom heard two; that Rice claimed that the hole he dug was only for panning gold and rubies, while Odom maintained that Rice had volunteered to dig the hole as a grave; that Rice denied taking $58 out of Berta Herndon's purse, while Odom said he did; that Rice denied wanting to have sex with Berta Herndon, while Odom said he did; that Rice claimed that Delbert Herndon was lying on the ground and that he was standing at Delbert's feet when he fired the rifle, while forensic evidence demonstrated that Delbert was either sitting or standing

specific intent to cause the death of a human being;

(8) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society;

(9) The murder was committed against a former or present peace officer, execu-

tive officer, officer of the court, judicial officer, or prosecuting attorney because of the exercise of official duty;

(10) The murder was committed against a witness or potential witness in a criminal or civil legal proceeding because of such proceeding.

Idaho Code § 19–2515(g).

if Rice was where he said he was; that Rice never saw the Herndons' hands bound, while Odom said they were; that Rice claimed to have marked the graves for the police, while the police found no such markers; and that Rice testified that Lene Odom asked for her share of the money, while she and Odom claimed it was Pizzuto's idea to give her the extra $100. Chenoweth also emphasized that Odom pointed a pistol at Rice's feet and made him dance, and that it was Odom who wanted to jump claims and hide the bodies.

It would not have altered the outcome for counsel to have argued more forcefully that the difference between the Bacon robbery and the Herndon murders was that Rice and Odom were not present during the Bacon robbery. Neither Rice nor Odom was present inside the cabin when Pizzuto struck the Herndons' heads with a hammer. Further, Pizzuto called himself a highwayman when he robbed and tied up Bacon, told Rice and Odom that he had killed the Herndons after he had identified himself as one, and bragged to his sister about being a highwayman as well as the slaying.

By the same token, we cannot see where greater focus on the assumption that Piz-

zuto alone tied up the Herndons would have gotten him. It is countersensical to suppose that the victims' hands or feet were tied together *after* they were killed. Pizzuto told his sister about tying up victims in Idaho, and he told a lieutenant with the Idaho County Sheriff's office that he could "get anything out of anybody he wanted by tying them tightly about the ankles . . .," he had tied up Bacon, and Odom said that the Herndons were tied up when he first saw them—which was after their heads were thumped.

Further, Judge Reinhardt found five statutory aggravating circumstances beyond a reasonable doubt: (1) at the time Pizzuto murdered Delbert Herndon, he also murdered Berta Herndon; (2) the murders were especially heinous, atrocious, cruel and manifested exceptional depravity; (3) by the murders and circumstances surrounding their commission, Pizzuto exhibited utter disregard for human life; (4) the murders were accompanied with the specific intent to cause the two deaths; and (5) by prior conduct and by conduct in the murders in this case, Pizzuto had exhibited a propensity to commit murder which will probably constitute a continuing threat to society.[3]

---

**3.** Idaho Code § 19–22515(g)(2), (5), (6), (7) and (8). The state district court's findings on these aggravating circumstances state:

   (a) At the time the Defendant murdered Del Dean Herndon, he also murdered Berta Louise Herndon.

   (b) The murders of the Herndons were especially heinous, atrocious, cruel, and manifested exceptional depravity. The Defendant approached his victims at a remote cabin in Idaho County near McCall, Idaho. He pulled a gun on them, he forced Mr. Herndon to drop his pants and crawl into the cabin, he bound their arms and legs, and then proceeded to smash in the back of their skulls with a hammer. The manner in which this unprovoked and calculated killing was accomplished exhibits a de-

pravity which exceeds all comprehension, explanation, and human decency.

   (c) By the murder and the circumstances surrounding its commission, the Defendant exhibited utter disregard for human life. The Defendant approached the Herndons at gunpoint and tied them up for the purpose of stealing from them. The circumstances demonstrate that the Herndons posed no threat to the Defendant's safety or to his escape from the scene of the robbery. The killing was accomplished not out of rage, revenge, or for personal gain. The murders were cold-blooded and pitiless. The killing was committed for the sake of killing.

   (d) The murders are defined as murder of the first degree by Idaho Code Section

The state district court also found "beyond a reasonable doubt that the mitigating circumstances which were presented do not outweigh any one of the Statutory Aggravating Circumstances listed . above as would make the imposition of the death penalty unjust." Thus, to establish prejudice Pizzuto must show that but for his counsel's deficient .performance the trial court would not have found *any one* of the statutory aggravating circumstances. *Cf. Zant v. Stephens,* 462 U.S. 862, 886–88, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (reimposing death sentence where only one of three aggravating circumstances had been held to be invalid); *Hoffman v. Arave,* 236 F.3d 523, 542 (9th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 323, (2001); *see also Beam v. Paskett,* 3 F.3d 1301, 1309 (9th Cir.1993) (as amended), *overruled on other grounds, Lambright v. Stewart,* 191 F.3d 1181, 1185 (9th Cir. 1999). However, he does not (and we believe, cannot) show how curing any of these claimed deficiencies would have avoided Judge Reinhardt's finding that "[a]t the time the Defendant murdered Del Dean Herndon, he also murdered Berta Louise Herndon."

Pizzuto suggests that it is unclear whether he committed two murders or one because the instructions permitted him to be found guilty as either a principal or as an accomplice. But this would have no effect on the aggravating circumstance codified at Idaho Code § 19–2515(g)(2), which does not require the defendant to be the sole killer. *See State v. Lankford,* 113 Idaho 688, 747 P.2d 710, 730–31 (1987) (trial court found aggravating circumstance (g)(2) where co-defendant played a greater role in the murders), *overruled on*

other grounds, *Lankford v. Idaho,* 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991). In any event, there was evidence from both Rice and Odom that Pizzuto was in the cabin when the thumps were heard and that this was after Pizzuto had come out of the cabin and re-entered it. They also agreed that Rice shot Delbert Herndon after the hammer blows had been delivered. And the pathologist opined that the blunt instrument blows to the back of Delbert Herndon's head were sufficient to cause his death. Thus, even had defense counsel pointed out the testimony again, and again made the arguments that Pizzuto now posits, there is not a reasonable probability it would have altered the finding that Pizzuto killed Berta Herndon when he murdered Delbert Herndon.

Finally, Pizzuto relies on *Conde v. Henry,* 198 F.3d 734 (9th Cir.1999), and *Cone v. Bell,* 243 F.3d 961 (6th Cir.2001), to argue that counsels' failure to contest or argue the aggravating factors was a complete breakdown in the adversary system requiring relief without regard to whether he has demonstrated actual prejudice. In an appropriate case, *Strickland's* prejudice prong may be presumed, *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), but this would only occur when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659, 104 S.Ct. 2039. Here, counsel contested the state's evidence at trial, and introduced mitigating evidence at sentencing; by no means did they *entirely fail* to engage the prosecution. Neither *Conde* nor *Cone* suggests otherwise, as there was *no* mitigating evidence *and* no final argument in *Cone,* and

18–4003(a) and 18–4003(d). The murders were accompanied with the specific intent to cause the deaths of Mr. and Mrs. Herndon.

(e) The Defendant, by prior conduct and by conduct in the commission of the murders in this case has exhibited a propensity to commit murder which will constitute a continuing threat to society.

no argument was allowed on the theory of defense in *Conde.* Thus, Pizzuto must show actual prejudice and, we conclude, he has failed to do so with respect to contesting the aggravating circumstances.

## B

### *Arguing Relative Culpability*

Pizzuto asserts that counsel did not marshal any of the evidence from trial showing that Rice and Odom had unsavory backgrounds and did not present additional evidence suggesting that they were unremorseful liars: a jail officer's report that Odom has "no remorse for what happened to the Herndons and feels he has beaten the system"; testimony that Odom bragged that, in California, "narcs who snitched were made to dig their own graves"; and a polygraph showing that Rice lied when he denied digging a grave for the Herndons, said that he marked the Herndon graves so the police could locate them, and claimed that he did not know the Herndons would be hurt when Pizzuto went to their cabin with the rifle.

Relative culpability can be a mitigating factor at sentencing, *Rupe v. Wood,* 93 F.3d 1434, 1441 (9th Cir.1996), and the Eighth Amendment requires that the sentencing judge or jury be permitted to give effect to all mitigating evidence presented by the defendant. "Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir.1998). However, inconsistencies between testimony given by Rice and Odom, and inconsistencies between what each said at trial and before, were brought out in the guilt phase. They were cross-examined about their criminal history as well as their plea negotiations for the Herndon murders. Chenoweth argued at sentencing that despite the jury's

verdict, there should still remain "some doubt as to the roles of these people in this grizzly event that took place at Ruby Meadows. . . ." In these circumstances we cannot say that counsel was ineffective. *Williams,* 52 F.3d at 1471.

But even if counsel should have offered or argued the jail officer's report, the testimony about Odom's bragging, and Rice's polygraph, the evidence was cumulative and therefore Pizzuto was not prejudiced. *Babbitt v. Calderon,* 151 F.3d 1170 (9th Cir.1998), *cert. denied,* 525 U.S. 1159, 119 S.Ct. 1068, 143 L.Ed.2d 72 (1999) (no prejudice where counsel failed to present cumulative mitigating evidence). There was evidence as well as argument that Odom was the leader of the group and the mastermind behind the robberies and murders. Aside from the polygraph, there was evidence before the court that Rice had volunteered to dig the grave and that the hole was too far from the river to be useful for panning; that the police never found any of the markers Rice claimed to have placed by the Herndon graves; and that Rice played a greater role in the murders than he claimed. When measured against the state's overwhelming aggravating evidence, there is no probability that additional evidence of a similar sort would have altered the outcome. *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052; *Bonin v. Calderon,* 59 F.3d 815, 836 (9th Cir.1995).

## C

### *Independent Psychological Experts*

Pizzuto argues that trial counsel never consulted an independent psychological expert (one reporting only to the defense) and failed adequately to prepare Dr. Emery, who had been chosen by the court but whom the defense called to testify at the sentencing hearing. In Pizzuto's view, the sentencing court found thirteen aggrava-

ting factors based directly on Emery's conclusion that Pizzuto would always be a danger to others whether in or out of prison, whereas evidence was available that Pizzuto could be housed and function safely in a prison setting if administered proper drugs. Pizzuto maintains that defense counsel could not prevent Emery's harmful conclusions from being introduced against him because they had failed to request an independent expert. Further, Pizzuto contends that he was sentenced without the court being informed of his history of head injuries and seizures, or receiving an expert opinion that his behavior could be accounted for by organic brain syndrome rather than an anti-social personality alone.

We conclude that Pizzuto has not shown that counsel failed to consult with an independent expert or to request one, but regardless, he was not prejudiced by counsels' efforts or preparation of Emery because the post-conviction evidence he has produced does not undermine our confidence in the sentence.

i

Pizzuto was examined before trial by Dr. Sarah Werner, a specialist in neurology. In an October 17, 1985 "History & Physical" Werner recites that Pizzuto had been followed by Dr. Greenwood, a general practitioner, and had reported several seizure episodes in 1985. Her impression was that Pizzuto's history of episodes of loss of consciousness heralded by an abnormal unpleasant smell was consistent with temporal lobe origin seizure, which he likely had in the past, but that the variability and unusually rapid clearing once out of medical observation, and the timing of the symptomatology, of the present episodes strongly suggest that they were a "pseudo seizure." Werner recommended

that Pizzuto be continued on Tegetrol and Phenobarbital.

Based on Pizzuto's behavior in the Idaho County Jail and the Lewis County Jail and on the confidential reports received from Dr. Werner and Dr. Greenwood, defense counsel moved on December 5, 1985 for a determination of Pizzuto's fitness to proceed to trial. The court granted this motion and appointed Dr. Roger White, a psychiatrist. White's report to the court was dated January 6, 1986 and indicated that Pizzuto was cooperative, alert and of average intelligence, without evidence of mental illness, and competent to stand trial.

Pizzuto also saw Dr. Emery for a psychological evaluation before trial. In his report to the court of January 23, 1986, Emery opined that Pizzuto had cognitive limitations, especially in his ability to anticipate the consequences of his behavior and the effects of his behavior on others; showed little ability to mediate emotions or tolerate ambiguity; and was preoccupied with violence and confrontation which probably reflected the victim role in which he found himself during his childhood. Emery, too, concluded that Pizzuto understood the nature of the proceedings and was both capable of assisting in his own defense and had the capacity to enter into a state of mind which could be an element of the offenses for which he was charged.

After the guilt phase and before sentencing, Judge Reinhardt observed that Pizzuto's mental condition would be a significant factor at sentencing and again appointed Emery to evaluate Pizzuto. Emery's April 24, 1986 report to the court indicates that his diagnosis of Pizzuto's condition was the same as before—not a mental illness in the sense of a thought or mood disorder that might be amenable to treatment with medication, but a personality disorder or set of behavioral patterns

including a limited capacity to anticipate the consequences of his behavior, to appreciate his behavior's effect on others, to mediate his emotions, to tolerate ambiguity, and to understand and accept responsibility. Emery also noted that he could not rule out the possibility that Pizzuto might cause harm to others, and that "[t]he prognosis for rehabilitation is statistically not good, but also not impossible."

Emery was called to testify at the sentencing hearing by the defense, and in rebuttal, by the prosecution. In addition to interviewing Pizzuto a second time, Emery interviewed Pizzuto's sisters and his aunt and listened to the mitigation evidence that Pizzuto presented. He testified that Pizzuto had a perception of the world as being populated by people who have the choice of being victimizers or victims. He explained how Pizzuto dwelt on the abuse he suffered at the hands of his stepfather and his need to demonstrate his own powers in competition with others in order to justify himself. Emery also stated that if he were going to try to engineer a childhood environment to create a predatory violent individual as an adult, he couldn't do better than Pizzuto's. He indicated that the probability of rehabilitating Pizzuto would not be high, and that in a prison environment Pizzuto would to some extent be a victimizer and to some extent a victim. On cross-examination Emery characterized Pizzuto as aggressive, impulsive, manipulative and as having little ability to tolerate ambiguity. When recalled by the state, Emery reiterated that Pizzuto will remain dangerous, violent, and manipulative in prison, no matter what kind of treatment he receives.

After sentencing, Pizzuto was seen by Dr. Michael Koerner, an epilepsy specialist, on September 9, 1987. Counsel advised the court in a December 1987 hearing that Koerner had concluded that Pizzuto might have a temporal lobe seizure disorder, but they did not offer his report containing examination results and diagnosis at post-conviction hearings. (Koerner did file an affidavit April 11, 1988 indicating that it is reasonable to make a working diagnosis of epilepsy, that Pizzuto's most recent EEG done when Koerner examined him was normal, that he has a family history of seizures, that his epilepsy can be fairly well controlled on modest amounts of medication, and that the fact that Pizzuto has done well for prolonged periods of time while not on medication is not contradictory because patients with genuine epilepsy may occasionally demonstrate a type of seizure pattern similar to Pizzuto's.)

In February 1987, Pizzuto filed an amended motion for post-conviction relief on the basis that he may have been suffering from a temporal lobe seizure disorder and an organic brain syndrome which was not detected prior to trial or sentencing. He submitted a report from James R. Merikangas, M.D., a neurologist and psychiatrist, dated April 1, 1988. Merikangas noted Pizzuto's history of head injury, his history of epilepsy diagnosis, the fact that Dr. Werner maintained Pizzuto on seizure medication, and Pizzuto's history of drug abuse. He suggests that Pizzuto is a brain damaged individual of which epilepsy is one of the symptoms, and that as a result of brain injuries suffered when Pizzuto was 2-½ and 14 years old his brain is defective and his cognition and ability to control his impulses are not those of a "normal" person.

The state submitted an affidavit from Dr. Werner, dated March 8, 1987. In it Werner opined that the probability that Pizzuto was suffering from temporal lobe organic disorder was exceedingly low given the results of her October 1985 examinations and testing. She also explained that

violence associated with epilepsy is not goal directed, but stereotyped, simple, unsustained, unplanned, and never part of a consecutive series of complex acts or in response to provocation prior to the seizure or premeditated. In her opinion, Pizzuto's episodes were most consistent with pseudo, or pretended, seizures, and no further studies were needed at the time she examined him in October 1985.

Dr. Emery also filed an affidavit February 6, 1987, in which he averred that his examination of Pizzuto prior to trial did not include neurological testing or consultation with a neurological psychologist, which might better detect evidence of organic brain damage. He suggested that Dr. Craig W. Beaver, a neuropsychologist, could undertake such an examination.

Judge Reinhardt held an evidentiary hearing April 7, 1988 at which Pizzuto testified. He denied the petition for post conviction relief April 15, finding that before trial, at Pizzuto's request, he was examined by Dr. Greenwood, a general practitioner; Dr. Werner, a medical doctor specializing in neurology; Dr. White, a psychiatrist; and Dr. Emery, a psychologist, and that after trial but prior to sentencing, Pizzuto's request by letter dated April 14, 1986 to hire Dr. Emery for a further examination for the purpose of testifying at the sentencing hearing was granted. Relying on Werner's affidavit, Judge Reinhardt also found that Pizzuto was not suffering from a temporal lobe organic disorder at any material time, but that even if he were, such a disorder could not account for, or have any bearing upon, the Herndon murders which the evidence demonstrates were premeditated, planned out, and part of a consecutive series of complex acts.

Finally, Pizzuto was evaluated by Dr. Beaver for purposes of his federal habeas proceeding. Beaver gave Pizzuto a comprehensive neuropsychometric examination February 12, 1996. His report notes that the April 1987 affidavit of Pizzuto's mother recounts brain injuries at 2-½ and 14, and that Pizzuto's medical records dating back to 1990 recount multiple occasions in which Pizzuto reported or was observed having seizure-like behavior. Pizzuto told Beaver that when he experiences seizures, he loses control and does not recall exactly what occurs; also, that "[h]e understands when he does have seizures, he can become very aggressive and violent towards others, but, again, indicates that he has little recall of those events when he has the actual seizures." According to Beaver, neuropsychometric testing showed evidence of "significant neurocognitive deficits that would be consistent with a prior history of brain injury and/or seizure disorder." Further, it indicated that Pizzuto has difficulty with impulse control and sustained attention in activities, as well as difficulty with decision-making in more demanding or unfamiliar circumstances. Beaver notes that when the murders occurred, Pizzuto indicated that he was not taking anti-seizure medication and had been heavily involved in polysubstance abuse. "This certainly would have affected his ability to make appropriate decisions and to effectively control his behavior in a highly charged and emotional circumstance."

Beaver also describes Pizzuto as demonstrating a strong tendency to overstate his accomplishments, being easily influenced by others "in a highly emotionally charged situation" not to show weakness, having a need for attention, and being rather passive dependent. Beaver agrees that from Pizzuto's history and records, he presents a "significant threat to others if he were again placed in an unstructured environment outside of the correctional system." However, given Pizzuto's age and conduct in prison, Beaver opines that Pizzuto does

not pose a high risk to others within the structure of a correctional facility and can function safely there if he continues on medication.

ii

■ Although Dr. Werner was not strictly speaking an independent expert, she did perform some of the functions that Pizzuto would have received from an independent expert. The same is true of Dr. Koerner. Werner reported on Pizzuto's temporal lobe origin seizures. Based in part on what she said, defense counsel sought and obtained the appointment of experts to consider whether Pizzuto was fit to stand trial. But there is nothing to show that counsel were aware, or should have been aware, of the existence of—or the need for—neuropsychological testing, because neither Dr. Werner, Dr. White, nor Dr. Emery made any mention of it. Indeed, it was Werner's opinion that Pizzuto's reported seizures were pseudo, or pretended, and that no further studies were needed.

Before sentencing, counsel apparently asked Judge Reinhardt for permission to hire Emery for the purpose of testifying at the sentencing hearing. The state district court's Findings of Fact, Conclusions of Law and Order on the amended petition for post-conviction relief refer to an April 14, 1986 letter from defense counsel to this effect. Although the letter itself is not in the record, and Pizzuto now faults trial counsel for having failed to request an independent expert, his counsel represented to the Idaho Supreme Court in their brief in support of a petition for rehearing that an independent defense expert *was* requested both pre-trial and pre-sentencing. There is no indication otherwise from trial counsel. Accordingly, we lack any basis for supposing that a *request* for an independent expert was not made, al-

though it obviously was *not granted* for sentencing. Emery was reappointed, but he was neutral—not independent. This means that his report went directly to Judge Reinhardt and to the prosecutor as well as to defense counsel.

Pizzuto relies on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and *Smith v. McCormick,* 914 F.2d 1153 (9th Cir.1990), for the proposition that an indigent capital defendant has a right to assistance of an independent psychiatric expert who does not report to the court and the prosecutor. In *Ake,* the Court recognized an indigent defendant's right to one independent expert when the state makes mental condition relevant to culpability and punishment, and to the testimony and assistance of a psychiatrist when the state presents psychiatric evidence of future dangerousness in a capital sentencing proceeding. *Ake,* 470 U.S. at 83–85, 105 S.Ct. 1087. In *Smith,* we clarified that the *Ake* right is a right to an independent, not neutral, psychiatrist. *Smith,* 914 F.2d at 1157. However, we need not decide whether Pizzuto could succeed on an *Ake* claim, because Pizzuto's issue on this appeal is ineffective assistance of counsel, not, as in *Smith,* constitutional adequacy of the court's response to a request for psychiatric testimony. He points to evidence in the federal district court that a competent defense attorney would have retained an independent expert in any case where the defendant's mental state was at issue and his life was at stake; however, this evidence (an affidavit from Katheryn L. Ross) does not purport to be based on a review of the record in this case or to express an opinion on the performance of defense counsel in this case.

Pizzuto further cites counsels' failure to provide Emory with prison records, and with the information needed to make a complete diagnosis. However, there is no

basis for concluding that further information would have made any difference in the outcome. It is clear that Judge Reinhardt sentenced Pizzuto based on the planned, calculated and complex series of acts that he found Pizzuto committed in conjunction with the Herndon murders. The judge found that whether or not Pizzuto had a seizure disorder, it would not account for, or have any bearing upon, the murders at Ruby Meadows. This is consistent with what Dr. Werner opined, and her opinion in this regard remains unchallenged. In sum, there is no evidence that Pizzuto was suffering from an actual seizure, even if he had a seizure disorder, when he went "hunting" for the Herndons, tied them up, took their possessions, bashed their heads, got help to bury them—and told his friends and his sister what he had done. Thus, even had defense counsel had the benefit of an independent expert (such as Beaver or Merikangas) for sentencing, the outcome would not have been different.

Pizzuto suggests two other respects in which he was prejudiced, but we are unpersuaded. First, he claims that Emery's harmful conclusions were disastrous because thirteen of the aggravating factors found by the sentencing court are traceable to Emery's testimony, e.g., that Pizzuto is manipulative, deceitful, impulsive, unmotivated to change behavior, aggressive, unable to tolerate ambiguity, antisocial, etc. However, for reasons we have explained, each of these findings can be disregarded because none has anything to do with statutory aggravating circumstance (g)(2)—that at the time Pizzuto murdered Del Herndon, he also murdered Berta Herndon—which Judge Reinhardt found that the mitigating circumstances did not outweigh.

Second, Pizzuto maintains that he was prejudiced by Emery's assessment of future dangerousness in that Beaver's more thorough report provides positive mitigating evidence while Emery's produced exclusively aggravating evidence upon which the trial court relied. The district court found that the differences between them are inconsequential, and we agree.

Beaver did not examine Pizzuto until eleven years after the murders and his affidavit speaks as of 1996. Accordingly, his opinion of dangerousness is qualified, and limited to "considering Mr. Pizzuto's age [40 in 1996] and in reviewing what I know at this point [in 1996] about his conduct while in the correctional facility, either in Michigan or Idaho." In this context, Beaver does not believe that if Pizzuto were to continue (as of 1996) within the structure of a correctional facility, he would pose a high risk to others; by the same token, if Pizzuto continues on medication, has structure, and remains abstinent from drugs or alcohol, he could function safely and adjust appropriately. However, Beaver agrees with the concern expressed in the original sentencing that Pizzuto in fact would present a significant threat to others if he were placed in an unstructured environment outside of the correctional system.

Emery's views came from two examinations that were contemporaneous with trial and sentencing. Emery did not see evidence of remorse and believed at that time that Pizzuto was a dangerous and violent individual. In his opinion, Pizzuto was preoccupied with the "victim" world and only really knows violence. Rehabilitation was not impossible, but "the odds are not real high." "[I]n a highly structured situation where he was given supervision, constraint, structure, guidance, he could perform tasks." Emery also testified that were things sufficiently structured and supervised, Pizzuto could work in prison. He predicted that Pizzuto would find a place within the prison hierarchy and to some extent would be a victimizer and to some extent a victim. He wouldn't rule

out a religious conversion for someone like Pizzuto, which could change attitudes, or improvement from psychotherapy, or mellowing at the age of forty which, he explained, appears to be the best tonic for antisocial personalities. Emery also clearly attributed Pizzuto's behavior, including the murders, to his childhood environment, a fact that Judge Reinhardt found to be mitigating.

Although there are differences between the evaluations of Emery and Beaver, we do not believe there is a reasonable likelihood that the outcome would have changed if Beaver had testified at sentencing. The prosecution could have called Emery to testify regardless. *Pawlyk v. Wood,* 248 F.3d 815, 824 (9th Cir.2001). Emery's testimony supports one of the facts found in mitigation and reinforces the defense theory that Pizzuto's abusive childhood was responsible for his adult behavior. To the extent that Emery's testimony also strongly supports facts found in aggravation, those facts are not prejudicial because they do not relate to statutory aggravating circumstance (g)(2). In any event, Beaver does not counter Emery's testimony that Pizzuto's personality traits were not going to change as a result of being in prison. At most, Beaver offers a somewhat more optimistic prognosis for Pizzuto's risk of danger to others in prison than Emery, but Beaver also does not preclude the possibility of *some* risk even from his vantage point of examining Pizzuto at 40. In these circumstances, and in light of all the other evidence about Pizzuto's propensity for violence (including from his jailers), we cannot see how Beaver's assessment would have added anything meaningful to the mitigation mix before Judge Reinhardt.

### D

*Absence from Presentence Interview*

■ Pizzuto argues that counsels' failure to attend or exercise any control over the interviews by the Idaho presentence report writer, Annette Jones, who administered no *Miranda* warnings prior to the interviews, was ineffective and prejudicial because Jones testified that Pizzuto was manipulative and deceitful, minimized his guilt, and displayed no remorse. He also maintains that the state district court's finding that Pizzuto has a propensity to commit murder was based on his confession to a Seattle murder which was elicited at the presentence interview. Taking the last point first, we disagree that this could be the case because Judge Reinhardt struck any reference to the Seattle murder from the presentence report and explicitly stated in his ruling on Pizzuto's petition for post-conviction relief that the murder charges in Washington were not considered in his findings on the death penalty.

As we shall explain in Part IV, it is now the law of this circuit that the Fifth and Sixth Amendments apply to a presentence interview in preparation for a capital sentencing hearing. *Hoffman v. Arave,* 236 F.3d 523, 538, 540 (9th Cir.2001). Nevertheless, we do not need to decide if Pizzuto's counsel were deficient in retrospect, because he suffered no prejudice.

Essentially everything in Jones's report or testimony was already before the court, or not relied upon. Although Pizzuto did not testify at either phase (he did make a statement, not under oath, at sentencing), the statements Jones related that he made to her were largely exculpatory and in any event, comport with overwhelming evidence which existed anyway. For instance, she stated that Pizzuto admitted or claimed that he tried to rob Crawford and Roberts—but Crawford, Rice, Odom and Lene Odom had all testified about Pizzuto's participation in the plan to rob the fishermen. Further, there is no indication

that Judge Reinhardt relied upon what Jones said Pizzuto said. Pizzuto told Jones that he helped bury the bodies and divide the money because the others made him do it—but Odom, Rice and Lene Odom all testified that he participated in the burial and distribution of cash. Jones stated that Pizzuto admitted he robbed Bacon, dealt drugs, and accidentally shot a man in Washington—but Bacon testified how Pizzuto robbed him, and Sgt. David Warrington testified to statements that Pizzuto made about killing John Jones in Washington on account of drugs. Also, there is no indication that Judge Reinhardt relied on Pizzuto's statement, or his involvement in drugs. Emery noted that Pizzuto had been fired from three jobs—but his ex-wife testified that he could not hold onto a job. Although Pizzuto did not admit to the murders and declined to talk about anything directly related to them, Jones stated that he said he was making love to Lene Odom at the time of the murders—but there is no indication that Judge Reinhardt gave any weight to this statement or its apparent incredibility. Emery stated that Pizzuto said it would have taken two people to tie up the Herndons unless you were good at it with one hand—but this is consistent with Pizzuto's theory that Odom and Rice did it and to the extent the statement is inculpatory, Bacon testified to being tied up by Pizzuto, Pizzuto's sister testified that Pizzuto admitted to tying up people, Blumbaum testified to Pizzuto's admission about binding ankles together, and Odom testified that the Herndons were bound when he first saw them. Jones stated her opinion that Pizzuto was manipulative, deceitful and unremorseful—but so did Emery, Blumbaum, Warrington, and Angelinna Pizzuto. In addition, there was testimony from Rice, Odom, Lene Odom, and his sister that Pizzuto bragged about the murders, and photographs taken with the Herndons'

disc camera were received into evidence that show Pizzuto posing for pictures of himself holding Delbert Herndon's gun. Therefore, even without Jones's report and testimony, there was ample basis for concluding that Pizzuto lacked remorse and none for finding the opposite in mitigation. Finally, Pizzuto was not prejudiced because this evidence relates to other factors or circumstances, but not to statutory aggravating circumstance (g)(2), which the court found alone outweighed the mitigating evidence.

E

*Using Prison Records*

■ Pizzuto contends that his trial counsel had a duty to use his Michigan prison record to demonstrate that he could be rehabilitated, had received good ratings for job performance, and had no history of violence while there. While the prison record shows that Pizzuto had fair to excellent ratings in his job performance, it also indicates that he had numerous "major misconducts" for "Threatening Behavior," "Unauthorized Occupation of a Cell," "Insolence" (twice), "Fighting," "Out of Place," "Disobeying a Direct Order," "Dangerous Contraband," "Attemp[ed] Escape," and "Contraband." These major misconducts did not occur only at the beginning of Pizzuto's incarceration and taper off over time; rather, they took place over a six year period. We cannot see how emphasizing this record would have helped Pizzuto; regardless, counsel presented the positive aspects of Pizzuto's Michigan incarceration at sentencing by introducing the affidavit of Russell Clark, who supervised Pizzuto, to show that Pizzuto had been productive, interested in his work, and performed his duties well while working at a prison convenience store. Chenoweth also elicited from Emery on direct-examination that Clark's affidavit,

which expressed the view that Pizzuto "is a productive person while in a structured environment," was "not contradictory" with his opinion. Thus, counsels' treatment of the Michigan record is a strategic decision that we will not second guess. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

## F

### *Cross-examining Jail Guards*

■ Pizzuto asserts that Chenoweth and Wayman should have cross-examined Blumbaum because they had records showing that he believed Odom was the least trustworthy of the three (Pizzuto, Rice, and Bill Odom), there was no evidence that Pizzuto had ever committed any of the acts that he told Blumbaum about, and other jailers believed Rice to be the most dangerous. As damaging as Blumbaum's testimony was, his report shows that it could have been worse. While Blumbaum believed that Odom was the "least trustworthy," he also heard Pizzuto threaten to kill his sister Angelinna. Blumbaum had reported that he personally had "no hope of [Pizzuto's] ever becoming a non violent member of society, short of a pre-frontal lobotomy and castration, and that might not change him sufficiently." Nor can we find where any of his jailers said that Rice was the most dangerous; Blumbaum and Officers Nida, Deter, Engstli, Mencer, and Squires all reported that Rice was cooperative, a good prisoner, remorseful, honest, or pleasant, and no one said he was violent or dangerous. In light of reports indicating that Pizzuto had threatened to beat Nida's "head in with a shampoo bottle," had threatened to break Deter's jaw, and had to be physically restrained from attacking Blumbaum, it would have been foolhardy for counsel not to let sleeping dogs lie.

## G

### *Calling Pizzuto's Sister to Testify*

Pizzuto argues that his trial counsel rendered ineffective assistance by calling Angelinna Pizzuto to testify because her testimony was similar to that of her sister, Toni, and putting her on the stand exposed her to cross-examination that brought out how Pizzuto had bragged about committing robberies where he tied people up and shot a man. However, her testimony in mitigation was a good deal more powerful, and personal, than Toni's, and only she had visited Pizzuto in prison. Her testimony directly supports one of the mitigating circumstances found by the court— that "[s]ome members of the defendant's family have expressed concern for his well being." Set against this, the negative aspects brought out on cross-examination were already in the record. Two other witnesses at sentencing testified that Pizzuto had shot someone else: Warrington testified that Pizzuto claimed to have accidently shot a man in Washington, and Roger Allen testified that Pizzuto claimed to have shot someone off his motorcycle. In addition, Bacon testified to being robbed and tied to a tree by Pizzuto, who called himself a highwayman, and Blumbaum testified to what Pizzuto told him about torturing people by binding and beating their feet.

Counsels' decision was plainly strategic, and probably beneficial overall. Regardless, there is no possibility that Angelinna Pizzuto's unfavorable testimony uniquely influenced Judge Reinhardt adversely at sentencing.

## H

### *Allowing Pizzuto to Question Witnesses*

Pizzuto argues that counsel has a duty to control the presentation of evidence to prevent prejudicial events such as allowing

him to cross-examine his ex-wife. In his present view the questions were abrasive and suggested that he was more interested in raking up old quarrels than saving his life. Pizzuto correctly points out that there is no right to "hybrid" representation, *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir.1994), but does not explain how counsel could have stopped him from *seeking permission* from the trial court to ask questions himself. Judge Reinhardt allowed him to do so, after advising Pizzuto that he should let counsel handle the entire examination. Even so, Pizzuto's inquiries of his former wife were largely beside the point; inquiries he posed to his sisters, on the other hand, were helpful as they elicited specific instances of childhood abuse without subjecting Pizzuto himself to cross-examination.

## I

### *Closing Argument*

Pizzuto contends that counsels' closing argument at sentencing was brief, failed to argue that the court could not find the aggravating circumstances alleged beyond a reasonable doubt, contained few specifics—especially about the culpability of Rice, Odom and Lene Odom—and had no overall theme. It was certainly brief. However, argument was to the same judge who presided over the trial and had heard closing argument there that extensively explored credibility and relative culpability. Further, it is not appropriate to single out counsels' oral presentation at the sentencing stage from other measures taken on his behalf. "Under the *Cronic* test, it is the *totality* of his efforts that we must examine, not just part of them in isolation." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir.1997) (no ineffective assistance where counsel failed to plead for leniency). In addition to what was done

and argued at trial, counsel challenged the Idaho procedure for capital sentencing, moved to strike portions of the presentence report, and presented percipient and psychological evidence about Pizzuto's abusive childhood. Chenoweth's argument made a plea for Pizzuto's life that was not without elegance; he asked whether, regardless of the jury verdict, some doubt did not linger in the judge's mind about the roles of the people in the event at Ruby Meadows; he invited Judge Reinhardt to consider whether there was something salvageable about Pizzuto in light of Dr. Emery's testimony that Pizzuto's worst of all childhood experiences was responsible for his behavior as an adult; he called for forgiveness for that, and for Pizzuto's suffering over the years; he noted the hope that Pizzuto's aunt held for him; he pointed out that Pizzuto was a victim of the system, his parents, and himself; and he asked for mercy. Based on our review of all the proceedings, and given the state's overwhelming evidence in aggravation together with the limited mitigating evidence available to the defense, we are confident that a longer or more detailed discourse would have made no difference.

## J

### *Failure to Prepare*

Pizzuto asserts that trial counsel generally failed to prepare for the sentencing hearing by failing to obtain a mitigation expert, an investigator, or an independent mental health expert, and by failing to attend or prepare Pizzuto for the presentence interviews. Essentially the contention is that the choices of counsel who are so unprepared cannot be defended as "strategic" under *Strickland*. However, Pizzuto does not suggest what additional evidence would have been discovered with

more preparation and investigation, or how it might have affected the outcome.

Pizzuto's counsel were faced with evidence that Pizzuto committed brutal murders after binding his victims and torturing Delbert Herndon by making him drop his pants and crawl around the cabin, then bragging about what he did. Beyond this, Pizzuto had attempted to commit another robbery just prior to the Herndon murders, committed another robbery almost immediately thereafter, and shot a man in Washington. He admitted to other shootings and robberies. And all of this occurred only a year after he had been released from prison on a rape conviction. A good deal of evidence in mitigation was developed from Pizzuto's family and Dr. Emery. No doubt counsel could have done more; more is always possible. But we cannot see any reasonable probability that more in this case would have led to a different sentence.

### III

Pizzuto argues that counsel were ineffective on direct appeal to the Idaho Supreme Court because their "Statement of Facts" failed to highlight any of the facts which showed Rice and Odom to be incredible or any of the evidence which militated against the existence of aggravating circumstances or supported the inference that Pizzuto was less culpable than the state contended. Claims of ineffective assistance on appeal are also governed by the *Strickland* standard. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

While the Statement of Facts did not go into detail about inconsistencies or impeachment, it was accurate, consistent with the trial testimony, and sufficient to alert the court that Rice and the Odoms were actively involved in the crime. Further, it is obvious from its opinion that the Idaho Supreme Court thoroughly reviewed the record and understood all the facts. *Pizzuto I*, 810 P.2d at 686–88. Finally, on this appeal, Pizzuto does not suggest any issues that could have been raised on direct appeal, but were not, that would have provided grounds for reversal. *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir.2001). Consequently, he has not shown prejudice.

### IV

Pizzuto submits that his death sentence must be vacated as the state district court improperly relied on statements obtained during Idaho and Michigan presentence interviews that were conducted without *Miranda* warnings or the assistance of counsel. The Idaho report was prepared by Annette Jones of the Idaho Division of Probation and Parole in connection with Pizzuto's conviction for the Herndon murders; the Michigan report related to Pizzuto's 1975 conviction for rape, and was prepared by Michael Berro of the Michigan Department of Corrections.

Since the federal district court's decision in these habeas proceedings, we held in *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001), that the Fifth and Sixth Amendments apply to presentence interviews in capital cases. *Hoffman* clearly controls with respect to Pizzuto's Idaho interview unless, as the state argues, it was implicitly overruled by the subsequent decision of the United States Supreme Court in *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). In *Penry*, statements from an uncounseled and non-Mirandized psychiatric interview were admitted into evidence. As AEDPA applied to Penry's petition, the question was whether the state court's decision was contrary to or an unreasonable application of Supreme Court precedent. The relevant precedent was *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), where

the Court held that a criminal defendant who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist if his statements can be used against him in a capital sentencing proceeding. The Court concluded that there were substantial differences between Penry's case and *Estelle;* that *Estelle* had never been extended beyond its particular facts; therefore, it was not objectively unreasonable for the Texas court to conclude that Penry was not entitled to relief on his Fifth Amendment claim. Unlike *Penry,* AEDPA does not govern Pizzuto's case. Thus, *Penry* is not squarely on point and does not overrule or undermine *Hoffman* such that we could ignore *Hoffman's* precedential effect. Accordingly, Pizzuto's Fifth and Sixth Amendment rights were violated by use of uncounseled, non-Mirandized statements against him.

However, for reasons we discussed in Part II–D, admission of the Jones report and receipt of her testimony did not have a "substantial and injurious effect" on the sentence. *Penry,* 121 S.Ct. at 1919–20 (noting that error in using report would justify overturning sentence only if petitioner could establish that it was not harmless under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

■ Admission of the Michigan report presents a different issue, as it was prepared in 1975 in connection with a non-capital proceeding. Routine, non-capital presentence interviews are not the type of situation in which *Miranda* warnings or counsel are required for purposes of the Fifth or Sixth Amendments. *Baumann v. United States,* 692 F.2d 565, 577 (9th Cir.1982). But we need not resolve

whether *Estelle* or *Hoffman* apply, or whether applying either would be *Teague*[4] barred because the error, if any, was harmless. Although Berro testified that Pizzuto threatened him on account of his being involved in Pizzuto's sentence for rape, and that Pizzuto claimed to have Mafia connections, Blumbaum also testified that Pizzuto threatened to "take care of" his jailers and their families, and Pizzuto's former wife testified that he had threatened to kill her, the judge, and Berro for their roles in his Michigan incarceration. Blumbaum further testified that Pizzuto told him he was related to the Mafia, and his ex-wife testified that Pizzuto told her that he was "either the fourth or fifth generation to Al Capone." In short, there was overwhelming other evidence that Pizzuto had threatened harm and claimed a relationship with the Mafia, so if there were error in admitting the Michigan presentence report, it was unquestionably harmless.

## V

■ Pizzuto argues that the trial court relied upon an unconstitutionally vague sentencing factor—that "the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity," Idaho Code § 19–2515(g)(5)—which the Idaho Supreme Court has not adequately narrowed. However, we addressed a similar issue in *Hoffman* and concluded that any error was harmless. There, as here, the petitioner's sentence was supported by other constitutional aggravating circumstances, and the trial court had determined that each aggravating circumstance, standing alone, outweighed the mitigating evidence. Pizzuto contends that a resentencing is re-

---

4. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (new rules of law, not dictated by precedent existing at the time the defendant's conviction became final, may not be announced in collateral proceedings).

quired notwithstanding *Hoffman*, as he has challenged every statutory aggravating circumstance on the grounds that the aggravating factors were not supported by the evidence and that the mitigating evidence weighed against each aggravating circumstance omitted important mitigating evidence. We have already explained why we disagree. The evidence supporting statutory circumstance (g)(2) was overwhelming and no material mitigating evidence was left out.

## VI

■ Pizzuto contends that the proportionality review of his sentence violated due process and was not performed in good faith despite a statutory obligation to do so. At the time of Pizzuto's sentencing, Idaho Code § 19-2827(c)(3) required the Idaho Supreme Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Pizzuto faults the court for reviewing a floating universe of capital cases, for focusing on those in which the death penalty has been imposed, and for incorrectly determining in which other cases the death penalty has been imposed and approved. The criticism appears well taken, but Pizzuto has not shown that "the review was so inadequate that [he] was essentially deprived of any review." *Rupe v. Wood*, 93 F.3d 1434, 1443 (9th Cir.1996). In *Pizzuto I*, the supreme court examined the proportionality of Pizzuto's sentence by considering "(1) the nature of, and the motive for, the crime committed; (2) the heinous nature of the crime; and (3) the nature and character of the defendant to determine whether the sentence was proportionate and just." *Pizzuto I*, 810 P.2d at 716. The court compared Pizzuto's crime to over thirty other first degree murder cases

and found it similar and proportional to *State v. Lankford*, 113 Idaho 688, 747 P.2d 710 (1987), which affirmed the death penalty for a defendant who, with an accomplice beat two campers to death with such force that their skulls had to be reconstructed by an anthropologist. Thus, we cannot say that Pizzuto failed to get *any* review. This being so, there is no constitutional violation because "due process will not recognize a less egregious injury." *Rupe*, 93 F.3d at 1443.

Nor does Pizzuto have a basis for claiming that the review was not in good faith, other than to say that the court does not always look at the same cases and all members of the court don't always agree on which ones to consider. However, we do not review for errors of state law, *Campbell v. Blodgett*, 997 F.2d 512, 522 (9th Cir.1992), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1337, 127 L.Ed.2d 685 (1994), and the constitution does not require us to look behind the Idaho Supreme Court's conclusion that Pizzuto's sentence was proportional to the sentences imposed in cases similar to his so long as he was not deprived of any review at all. *Walton v. Arizona*, 497 U.S. 639, 656–57, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Accordingly, we decline to construct a universe of cases or conduct a de novo comparison of Idaho cases with the facts of this case. *Martinez–Villareal v. Lewis*, 80 F.3d 1301, 1308–09 (9th Cir.1996).

Pizzuto also maintains that the Idaho Supreme Court engaged in inaccurate fact finding, further undermining confidence in its proportionality review, when it noted that "at the sentencing hearing the evidence included two outstanding warrants for the arrest of Pizzuto charging him with first degree murder in connection with two murders in the state of Washington." *Pizzuto I*, 810 P.2d at 712. However, we do not read the court's proportionality analy-

sis as relying on these facts; rather, the supreme court mentioned the warrants in its discussion of whether there was sufficient evidence to support the statutory aggravating circumstance of propensity to commit murder, Idaho Code § 19–2515(g)(8).

Finally, Pizzuto contends that he was denied due process because one of the factors considered by the Idaho Supreme Court was "the heinous nature of the crime," which, in his view, rests on an unconstitutionally vague definition because he believes that the statutory aggravator, "especially heinous, atrocious or cruel, manifesting exceptional depravity," is unconstitutionally vague. Even if the statutory aggravating circumstance were unconstitutionally vague for purposes of adequately channeling a sentencer's discretion (an issue we do not reach), it does not mean that considering how "heinous" the nature of a crime is somehow makes that criterion unconstitutionally vague for purposes of comparing the sentence imposed in one case with others.

## VII

Pizzuto asserts that the trial court's reliance on his low intelligence, lack of education, and limited vocational skills; assertion of his right not to incriminate himself; and mental disorders produced by the abuse he suffered as a child as support for imposing the death penalty violates the Eighth Amendment. Relying on *Clemons v. Mississippi*, 494 U.S. 738, 752, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), and *Beam v. Paskett*, 3 F.3d at 1311, he points out that when an invalid aggravating factor has been weighed in the balance, reweighing is required. Further, he contends that the trial court failed to recognize that some of these circumstances should have been considered in mitigation. In his view, this

makes the court's ultimate determination unreliable.

We need not decide whether these particular characteristics of Pizzuto make a " 'measurable contribution to acceptable goals of punishment,' " *Beam*, 3 F.3d at 1308 (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)), because even assuming they do not, there is no basis for vacating Pizzuto's sentence. As we have explained, statutory aggravating circumstance (g)(2) alone suffices, and it is not supported by the offender characteristics about which Pizzuto complains. *Cf. Beam*, 3 F.3d at 1311 (reweighing required because improper aggravating evidence supported all of the aggravating circumstances found by the trial court).

Nor must the writ be granted for the trial court to reweigh Pizzuto's personal characteristics as mitigating circumstances against the statutory and non-statutory aggravating factors. Pizzuto contends that his mental and emotional deficits, lack of education and skills, and experience of abuse as a child should have been considered as mitigating factors. There is no question that such evidence of background and character is relevant, *Penry*, 121 S.Ct. at 1920, but Judge Reinhardt did not refuse to consider these things. He specifically stated that he considered *all* relevant evidence in mitigation and aggravation. Having *considered* all the evidence, the judge was not obliged to *find* it mitigating; he was "free to assess how much weight to assign to such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir.1998).

## VIII

Pizzuto contends that he is entitled to an evidentiary hearing on his claims of ineffective assistance of counsel at trial and sentencing, that he was denied an impar-

tial judge, and that the trial judge improperly relied on undisclosed information at sentencing. The district court meticulously went through every one of Pizzuto's claims. To help it decide whether Pizzuto was entitled to an evidentiary hearing on any of the grounds in his petition, the court ordered him to make an offer of proof regarding extra-record evidence which he would seek to present through such a hearing. Pizzuto submitted substantive affidavits from Beaver, Ross, and himself. Having considered them along with everything in the record, the court concluded that there is no reasonable probability that Judge Reinhardt, absent the alleged errors by defense counsel, would have found the balance of aggravating and mitigating circumstances did not warrant death; thus, Pizzuto failed to make a colorable claim warranting an evidentiary hearing. It found that Pizzuto could not establish prejudice on his trial claims either, as there is not a reasonable probability a different outcome would have resulted had the jury heard evidence that Pizzuto suffered from a seizure or other psychological disorder. It held that Pizzuto procedurally defaulted his claim of judicial bias, and failed to show either cause or prejudice to excuse it. Finally, the district court held that neither discovery nor an evidentiary hearing was justified on the strength of Pizzuto's unsupported and speculative assumptions that the sentencing judge relied on information that Pizzuto didn't know about.

Prior to AEDPA, the rule was:

"A habeas petitioner is entitled to an evidentiary hearing on a claim if '(1) the petitioner's allegations, if proved, would entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.'" *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir.1992). No hearing is required if "there are no dis-

puted facts and the claim presents a purely legal question." *Id.*

*Williams*, 52 F.3d at 1484. We have also recognized that "[i]n a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court." *Smith v. Stewart*, 241 F.3d 1191, 1197–98 (9th Cir.2001) (quoting *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir.1994)). However, this does not establish a per se rule requiring an evidentiary hearing; rather, a petitioner must establish that his allegation of ineffective assistance, if proven, would establish both deficient performance and prejudice. *Babbitt v. Calderon*, 151 F.3d 1170, 1177 (9th Cir.1998). Pizzuto had an evidentiary hearing in connection with his motion for post-conviction relief, but has not had one specifically with respect to his ineffective assistance claims. Nevertheless, a more developed factual record is not necessary given Pizzuto's offer of proof, evidence adduced in post-conviction proceedings, and the state trial court's rulings in those proceedings.

A

With respect to sentencing, Pizzuto argues that his affidavits are unrefuted; the record shows counsel acted on insufficient information and offers no support for their choices being strategic; and he has demonstrated how the defects led to the death sentence. We have already discussed why Pizzuto has not shown prejudice even fully crediting Beaver's affidavit; Ross's affidavit states general propositions about good lawyering that do not require an evidentiary hearing to explore. Beyond this, Pizzuto points to no additional evidence that would be presented if an evidentiary hearing were held or how it would change the outcome at the sentencing hearing.

## B

With respect to the guilt phase, Pizzuto claims that his counsel only realized shortly before trial that Rice and the Odoms would be key witnesses against Pizzuto; that they made no effort to investigate Bacon; that the record does not show they tried to develop or obtain mitigating evidence about Pizzuto; that they failed to obtain assistance of an independent mental health expert or consult with anyone about whether any kind of mental defense was possible; and that nothing shows that they considered how Pizzuto might escape a conviction under Idaho's accomplice liability law. He submits that it is impossible to evaluate the impact of defense counsels' deficiencies without an evidentiary hearing, noting, for example, that had they been more on top of things they might have pursued a negotiated resolution short of trial.

■ It is true that trial counsel did consider Pizzuto's trial an "everyday ordinary" trial until they received notice of the state's intent to seek the death penalty. But Chenoweth was an experienced trial lawyer and "[i]t is well established that an ineffective assistance claim cannot be based solely on counsel's inexperience" in capital cases. *Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir.1998). Pizzuto does not show how counsels' preparation would have been different, or how different preparation would have changed the outcome of the trial. They had prior statements and transcripts of the guilty pleas of the Odoms and Rice, and Pizzuto suggests nothing more that more investigation would have produced. *Ortiz*, 149 F.3d at 933 (ineffective assistance claim lacks merit when petitioner fails to specify what further investigation would uncover); *Ceja v. Stewart*, 97 F.3d 1246, 1255 (1996) (claim fails without explanation of what compelling evidence additional investigation would have turned up). Counsel had a viable theory of defense—that Rice and Odom did it, and framed Pizzuto—which counsel developed by evidence of the pair's prior relationship, inconsistent statements, and prior criminal histories.

We have discussed why Pizzuto was not prejudiced at sentencing by his counsels' failure to obtain an independent expert who would have testified along the lines of Dr. Beaver's affidavit. For the same reasons, there is no reasonable probability that testimony as set out in his affidavit would have altered the jury's verdict. In addition, there is nothing to show that counsel were aware (or should have been aware) prior to trial of the need for further investigation, testing or consultation based on what they had been told by Dr. Werner, Dr. White and Dr. Emery. *See, e.g., Murtishaw v. Woodford*, 255 F.3d 926, 945 (9th Cir.2001) (no ineffective assistance when nothing suggests experts requested information); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir.1995).

Because Pizzuto points to nothing substantial on any score that further investigation or preparation would have produced, there is nothing to resolve and thus no reason for an evidentiary hearing.

## C

Pizzuto relies on unrebutted affidavits from his mother, father and sister averring that, at the start of the trial, Judge Reinhardt told Mrs. Pizzuto "[y]our son is a murderer—get it through your head—we're going to burn his ass" to argue that he should have an evidentiary hearing on his claims of judicial bias. Pizzuto asserts that one of his trial lawyers, Nick Chenoweth, who also represented him at sentencing, on appeal, and in consolidated post-conviction relief proceedings, was present when the comments were made. Pizzuto

first raised the claim of judicial bias in his second and third petitions for post-conviction relief; in them, he explained that he had not done so earlier because he was unaware of the claims, and his lawyer's relationship with the trial judge created an actual conflict of interest sufficient to excuse the default. In both instances, the trial court and Idaho Supreme Court held that the claims were procedurally defaulted because they were known or reasonably should have been known at the time Pizzuto brought his first petition. *Pizzuto II*, 903 P.2d at 60; *Pizzuto III*, 10 P.3d at 744–45.

■ Pizzuto maintains that he has shown both cause and prejudice for failing to raise the issue in his first petition. If so, the procedural default would be excused. *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir.1997). "A showing of cause 'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986), 106 S.Ct. 2639, 91 L.Ed.2d 397). Thus, cause is an external impediment such as government interference or reasonable unavailability of a claim's factual basis. *Martinez–Villareal*, 80 F.3d at 1305 (citing *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)).

■ Pizzuto argues that proper resolution of the "cause" issue depends on the nature of the relationship between Chenoweth and Judge Reinhardt, as well as whether Chenoweth was aware of Judge Reinhardt's remarks. He relies on the Eleventh Circuit's decision in *Porter v. Singletary*, 49 F.3d 1483, 1489–90 (11th Cir.1995), to urge that he is entitled to an evidentiary hearing because his witnesses' sworn allegations are unrefuted. However, the evidentiary hearing ordered in

*Porter* was based on a far different set of facts. Seventeen years after the statement was made, the Clerk of Court called Porter's counsel with information that the judge who presided at Porter's trial had said to him before trial that he had changed venue from one county to another in part because the county of transfer "had good, fair minded people here who would listen and consider the evidence and then convict the son-of-a-bitch." Then the judge said, "he would send Porter to the chair." There was recent corroboration for this evidence of predisposition from comments the judge made to news reporters. In these circumstances, the court of appeals was persuaded to order an evidentiary hearing on whether Porter had established cause to excuse having procedurally defaulted the issue. An officer of the court had come forward *sua sponte* with specific and ostensibly reliable evidence that the judge had a fixed predisposition to sentence Porter to death if he were convicted, and the remarks that the clerk reported were unanticipated and unpredictable. Here, Pizzuto could reasonably have obtained knowledge of what Judge Reinhardt allegedly said, because if the judge made the comments attributed to him, they were made to Pizzuto's family.

In any case, Pizzuto has not shown cause arising out of Chenoweth's relationship with Judge Reinhardt. Pizzuto's affidavit indicates that the two had taken vacations together and that Judge Reinhardt once worked for Chenoweth. On account of this relationship, Pizzuto reasons, Chenoweth was inhibited from challenging the judge's partiality. However, Pizzuto does not show how this kind of relationship amounts to an actual conflict of interest such that counsel would not have challenged Judge Reinhardt's behavior. *See Cuyler v. Sullivan*, 446 U.S. 335, 345–50, 100 S.Ct. 1708, 64 L.Ed.2d 333

(1980); *see also Barnhill v. Flannigan* 42 F.3d 1074, 1077–78 (7th Cir.1994) (noting the general rule that an attorney's actual conflict can be sufficient cause to excuse a procedural default, but holding no actual conflict shown by allegation that public defender on appeal refrained from raising ineffectiveness of trial counsel who was also a public defender). In fact, Pizzuto's counsel moved for a new trial and to disqualify Judge Reinhardt from participating in further proceedings based on a charge of judicial misconduct, and challenged Judge Reinhardt's lack of partiality during the sentencing phase in Pizzuto's amended first petition for post-conviction relief. If counsel had truly been conflicted, they would not have taken either step. As we cannot presume that a conflict exists where none is demonstrated, *see Cuyler*, 446 U.S. at 347–48, 100 S.Ct. 1708, Pizzuto has failed to establish cause.

## D

Pizzuto lastly contends that the district court erred by denying relief without holding an evidentiary hearing or granting discovery on his claim that the sentencing judge improperly relied on undisclosed information in imposing his death sentence, and was privy to additional information, both on and off the record, from his presiding over Rice's and Odom's prosecutions. But Pizzuto has not shown that Judge Reinhardt relied on any evidence outside of the record. Rather, he faults the judge for not revealing what information he had before him and what, if any, consideration he gave to it; by failing even to mention Rice and the Odoms, Pizzuto suggests, the court shielded from review the impact of any knowledge it received while presiding over their cases. While Judge Reinhardt did not give a detailed list of what he relied on in sentencing, he did state that he was considering such evidence and arguments as were presented

at the sentencing hearing and at trial, and there is no indication in his order, or in the record generally, that he considered more than that. *Cf. Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (vacating death sentence because the trial court's findings relied upon a presentence report part of which was not disclosed to the defense); *Correll v. Stewart*, 137 F.3d 1404, 1416 (9th Cir.1998) (no *Gardner* error when judge does not rely on ex parte communication in sentencing); *Paradis v. Arave*, 20 F.3d 950, 956–57 (9th Cir.1994) (no showing that judge relied on undisclosed material when he listed things he would consider and co-defendant's in-camera submissions and evidence from his trial were not referred to). We agree with the district court that there is no basis for an evidentiary hearing.

## IX

In a supplemental brief filed after the decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), was rendered, Pizzuto contends that it overrules *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and that he was therefore unconstitutionally deprived of his right to have a jury, rather than a judge, determine his sentence. We have already held "that while *Apprendi* may raise some doubt about *Walton*, it is not our place to engage in anticipatory overruling. The Supreme Court has specifically directed lower courts to 'leav[e] to this Court the prerogative of overruling its own decisions.' " *Hoffman*, 236 F.3d at 542 (brackets in original, quoting *Agostini v. Felton*, 521 U.S. 203, 207, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). Therefore, this argument is foreclosed.

## CONCLUSION

We conclude that Pizzuto has failed to demonstrate deficient performance and ac-

tual prejudice for his ineffective assistance of counsel claims at sentencing and on direct appeal. Although his Idaho presentence interview violated Pizzuto's Fifth and Sixth Amendment rights, the error with respect to it and his Michigan presentence interview had no substantial and injurious effect on the sentence and is therefore harmless. Likewise, it is immaterial whether the trial court may have relied upon one unconstitutionally vague sentencing factor because it determined that each remaining statutory aggravating circumstance outweighed the mitigating evidence. We cannot say that the Idaho Supreme Court failed to give Pizzuto *any* proportionality review, thus his rights to due process were not violated. The state trial court considered all evidence in mitigation and aggravation and did not refuse to consider personal characteristics in mitigation. Pizzuto is not entitled to an evidentiary hearing on his claims for ineffective assistance at trial and sentencing, judicial bias, or reliance by the court on undisclosed information at sentencing. Finally, Pizzuto was not unconstitutionally deprived of any right to have a jury, rather than a judge, determine his sentence.

AFFIRMED.

B. FLETCHER, Circuit Judge, concurring in part and dissenting in part:

First, I object to the premature filing of this opinion. The Supreme Court has granted certiorari in *Arizona v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (2001), to decide whether *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), overrules *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and requires that a jury, rather than a judge, find the aggravating factors that expose a defendant to death. Because Pizzuto raises the same objection to Idaho's judge-sentencing scheme, the Supreme Court's resolution of this issue may be dispositive on the sentencing issue in

this case. It is inappropriate and contrary to the usual practice of our court to file an opinion while a controlling issue is pending before the Supreme Court. Nonetheless, the majority insists upon filing immediately. The majority agrees to hold the mandate, but, in the meantime, we are airing views on issues that may be rendered moot if the Supreme Court overrules *Walton*. The majority places the parties in an awkward position in that they must proceed with petitions for rehearing and en banc consideration and responses thereto, all to no purpose since the opinion has no precedential value until the mandate issues.

While I express no opinion on the *Apprendi* claim pending the resolution of *Ring*, I am compelled currently to express my opinion on Pizzuto's remaining claims some of which may be rendered moot. With that caveat, I concur in the results reached by the majority with respect to Pizzuto's claim of ineffective assistance of counsel on appeal, his challenge to the Idaho Supreme Court's proportionality review, and his request for an evidentiary hearing on judicial bias, the trial judge's reliance on undisclosed information at sentencing, and ineffective assistance of counsel at trial. I respectfully dissent from the majority's opinion with respect to Pizzuto's claim of ineffective assistance of counsel at sentencing, the violation of his Fifth and Sixth Amendment rights in his presentence interviews, the constitutionality of Idaho's "heinous, atrocious, or cruel" aggravating factor, and the trial court's reliance on unconstitutional, non-statutory aggravating factors.

I.

Ineffective Assistance at Sentencing

As the majority correctly explains, under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we must determine whether defense counsel's performance in the penalty phase of

Pizzuto's trial was deficient and whether the deficiencies prejudiced the defense. For prejudice, the question is whether there is a reasonable probability that, but for counsel's unprofessional errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Id.* at 694–95, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Notably, the Supreme Court has made clear that prejudice for ineffective assistance need not be established by a preponderance of the evidence. *Id.* ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

The majority concludes that Pizzuto has failed to satisfy this two-prong test. However, to reach this conclusion, the majority relies on unsupported rationalizations and refuses to view the deficiencies asserted by Pizzuto as a whole. In view of all the deficiencies, defense counsel's representation fell below "an objective standard of reasonableness ... under prevailing professional norms," and there is a reasonable probability that, but for their errors, Pizzuto would have been sentenced to life rather than death. *Id.* at 688, 104 S.Ct. 2052.

## A

### Failure to Challenge the State's Case in Aggravation

Under Idaho's capital sentencing law, a defendant convicted of first degree murder may not receive the death penalty unless the State establishes at least one of ten aggravating circumstances beyond a reasonable doubt. Idaho Code § 19–2515 (1984). Pizzuto's defense counsel, two attorneys wholly inexperienced in capital cases, failed to fulfill their constitutional duty to subject the State's case in aggravation to the meaningful adversarial testing that ensures a just result. *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052 ("[C]ounsel's role in [a capital sentencing] proceeding is ... to ensure that the adversarial testing process works to produce a just result.").

Evidence was readily available to cast doubt on the existence of some of the aggravating factors asserted by the State. For example, the trial judge put particular emphasis on the fact that Pizzuto tied the victims before killing them in finding that the murders were "heinous, atrocious, and cruel" and demonstrated an "utter disregard for human life."[1] Yet Rice testified that he did not see the victims tied when he went into the cabin and shot Mr. Herndon, and Odom testified that he saw them tied up only after he had divided up the money and returned to the victims' cabin to dispose of the bodies. Also, the pathologist testified that he could not determine whether the bodies had been tied before or after death.

The majority argues that other evidence was sufficient to convince the trial court that Pizzuto had tied the Herndons prior to killing them. Pizzuto's sister testified that he bragged about tying up a man and woman and shooting the man; Roger Bacon testified that Pizzuto had tied him up

---

1. The trial judge also noted, in his finding that the murder was heinous, atrocious, and cruel, that Pizzuto forced Mr. Herndon to drop his pants and crawl into the cabin. However, in deciding that the crimes displayed an utter disregard for human life, the trial judge's entire focus was on the fact that Pizzuto had tied the victims before killing them, so they presented "no threat to his safety or to his escape from the scene." Findings of the Idaho Dist. Ct. at 5.

and robbed him; and Lt. Paul Blubaum testified that Pizzuto told him he could get anything out of anyone by tying their ankles and then beating the bottom of their feet. However, the State's circumstantial evidence was not so overwhelming in light of the evidence that was available to the defense on this issue. Defense counsel might have raised a reasonable doubt in the trial judge's mind had they reminded the court of Odom, Rice, and the pathologist's testimony.[2]

Also, the State's theory that Pizzuto deserved the death penalty while his co-defendants did not depended primarily on the story told by Rice and Odom at trial. Therefore, defense counsel should have referenced the evidence from the guilt phase that showed Rice and Odom were not credible witnesses. During the guilt phase, defense counsel demonstrated that Rice and Odom had criminal records and used drugs. Defense counsel also exposed numerous inconsistencies in the stories told by Rice and Odom. They contradicted each other on many details such as the number of thumps they heard while Pizzuto was in the cabin and whether Pizzuto was wearing or carrying Mr. Herndon's boots when he emerged.

Rice and Odom gave conflicting testimony accusing each other of acts that each denied. Odom testified that prior to the murders Rice said he was going to dig graves. According to Odom, Rice tried to make him shoot Mr. Herndon in the head, and Rice complained that Mrs. Herndon was killed before he could have sex with her, which Rice denied. Odom accused Rice of taking money from Mrs. Herndon's purse, which Rice also denied. Rice, in turn, gave testimony that prior to the murders Odom suggested they jump a mining claim, kill the miner, and bury the body. He also testified that Odom held a gun on him and that Odom bragged, "That's the way they do things here in Idaho," after the murders.

In the guilt phase, defense counsel also demonstrated that Rice had lied repeatedly to the police. At various times, Rice (1) denied any involvement in the murders, (2) admitted to hitting Mr. Herndon in the head with a hammer, and (3) admitted to shooting Mr. Herndon. In his statements to the police, Rice repeatedly said that "they" committed the murders. He conceded that his statements to the police were not true, but he could not explain why he used the word "they" when talking about who committed the murders.

Additionally, evidence not introduced at the guilt phase was available to show Rice and Odom lacked credibility. There was evidence that Odom said to an acquaintance, after the murders but before the arrests, "Where I come from, when we find a narc, we just take them out and make them dig their own grave," and that Rice's lie detector test indicated he lied when he said he had no advance knowledge of the murders.[3]

Defense counsel also possessed records showing that Lt. Blubaum, a prosecution witness, believed Odom was the least trustworthy of the three co-defendants.

---

2. The majority also asserts that tying the victims after the murders is countersensical. However, it is not apparent how Pizzuto could have tied both victims by himself if they were alive at the time and he was alone as Rice and Odom contended.

3. Polygraph evidence would have been admissible as relevant mitigating evidence for Piz-

zuto's sentencing hearing. *See Rupe v. Wood,* 93 F.3d 1434, 1441 (9th Cir.1996), *cert. denied,* 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997) (reversing death sentence because trial court excluded polygraph evidence of an accomplice that was relevant to the question of what role the accomplice truly played in the crimes).

However, defense counsel did not bother to cross-examine Lt. Blubaum at all and failed to present available evidence that other jailers believed Odom was more dangerous than Pizzuto, was a manipulator, had no remorse for the murders, and felt he had beaten the system. Such evidence would have defused Lt. Blubaum's testimony and cast more doubt on the credibility of Odom.

The majority argues that defense counsel's failure to cross-examine Lt. Blubaum and examine the other jailers was a strategic choice. Putting the other jailers on the stand may have elicited more damaging testimony than good, but Lt. Blubaum had already given his most damaging testimony. Lt. Blubaum testified that Pizzuto had intimidated jailers, talked continually about sex and violence, and bragged about torturing people by tying up their feet and beating their swollen feet and putting snakes in mailboxes to bite people. Defense counsel's failure to cross-examine him after this testimony cannot be dismissed as a strategic choice under these circumstances.

Finally, defense counsel should have highlighted for the trial judge the difference between the Bacon robbery and the Herndon murders. Specifically, they should have noted that, when Pizzuto robbed Roger Bacon, he was alone and did not harm him. This evidence suggests that the presence of Rice and Odom was key in the murder of the Herndons and implies that the co-defendants were more involved than their testimony indicated. The majority attempts to rationalize its conclusion that Pizzuto was not prejudiced by counsel's failure to present this evidence by arguing that neither Rice nor Odom was present inside the cabin when Pizzuto struck the Herndons. The majority's argument assumes that Rice and Odom's testimony was truthful, but the

point of presenting this evidence suggests that their version of the murders was not truthful.

There is no tactical reason why defense counsel would have chosen not to call the sentencing judge's attention to this evidence. *See Ainsworth v. Woodford,* 268 F.3d 868, 874 (9th Cir.2001) (finding ineffective assistance where no tactical reason could explain counsel's failure to investigate and present available mitigating evidence). The evidence was easily accessible, and it was not as if a reasonable doubt defense would have contradicted the defense's case in mitigation. The introduction of this evidence, with the exception of the testimony of the jailers other than Lt. Blubaum, would not have run the risk of opening the door to damaging rebuttal evidence that was not already before the court. *See Clabourne v. Lewis,* 64 F.3d 1373, 1385 (9th Cir.1995) (observing that defense counsel "had nothing to lose by asking the expert witnesses to testify at the sentencing hearing; their testimony would not open the door to hidden evidence of aggravating circumstances"); *cf. Burger v. Kemp,* 483 U.S. 776, 791–92, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (concluding that defense counsel made reasonable tactical choices in not presenting evidence that would open the door to damaging rebuttal); *Campbell v. Kincheloe,* 829 F.2d 1453 (9th Cir.1987) (same), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). With a different trier of fact at the sentencing stage, defense counsel could not assume that these arguments were hopelessly foreclosed by the guilty verdict. *Cf. Felker v. Thomas,* 52 F.3d 907, 911–13 (11th Cir.1995) (finding that counsel was not ineffective for failing to resort to a "residual doubt" strategy when the sentencing jury had just found the defendant guilty), *opinion supplemented on denial of rehearing,* 62 F.3d 342 (11th Cir.1995), *cert. denied,* 516 U.S. 1133, 116

S.Ct. 956, 133 L.Ed.2d 879 (1996). For that matter, the jury never specifically found that Pizzuto was more than an accomplice to the crime.[4] There is no reasonable explanation for counsel's failure to contest the aggravating circumstances.

Furthermore, the trial judge's decision on the existence of the aggravating circumstances determined whether Pizzuto was death-eligible and what, if any, aggravating factors would weigh against the mitigating factors. Advocacy on this issue at sentencing was critical to Pizzuto's fate. Although the trial judge explained that the evidence at trial would be considered for sentencing purposes, a reasonably competent attorney would have reminded the judge of the favorable evidence, particularly when the trial was as lengthy and complicated as this one[5] and when the sentencing hearing was not conducted until nearly two months after the trial ended.

To find no prejudice, the majority cites two cases for the proposition that evidence presented in the guilt phase need not be repeated in the sentencing phase. In *Williams v. Calderon,* we held that, because mitigating evidence was presented in the course of the guilt phase, there was no prejudice when defense counsel presented no mitigating evidence during the penalty phase. 52 F.3d 1465, 1471 (9th Cir.1995). In this case, some of the evidence regarding the credibility of Rice and Odom was not presented to the court in the guilt phase, including Lt. Blubaum's reports, Rice's lie detector test, and Odom's statement about making "narcs" dig their own graves. Furthermore, *Williams* is distinguishable. In *Williams,* the court was reviewing a California trial in which a jury

decided whether aggravating circumstances existed. *Id.* at 1468. Normally a jury will sit through a sentencing hearing almost immediately after conviction, but, in Pizzuto's case, the judge did not hold the sentencing hearing until almost two months after the conviction. The judge may well not have remembered the numerous details of the trial two months later or carefully sifted through the lengthy trial transcript before sentencing.

The majority also cites *Woratzeck v. Stewart,* which found that there was no prejudice when defense counsel failed to present evidence that was available in the presentence report. 97 F.3d 329, 336–37 (9th Cir.1996). A presentence report is a discrete document prepared for the court specifically for sentencing. As such, a presentence report contrasts sharply with thousands of pages of trial transcript from a trial held two months earlier. Defense counsel's failure to present evidence from the previous trial is much more likely to affect the outcome of the sentencing phase.

Because so much time passed between the conviction and the sentencing, and this evidence was substantial enough that it reasonably could have altered the balance between the mitigating and aggravating circumstances, there does seem to be a reasonable probability that, but for defense counsel's failure to reargue the favorable evidence from trial, the judge would have sentenced Pizzuto to life rather than death. Also, considered cumulatively with counsel's other deficiencies discussed below, defense counsel's failure to contest the State's case in aggravation was prejudicial. *See Harris v. Wood,* 64 F.3d 1432,

---

4. The jury charge permitted a finding of guilt on both murder theories if the jury found that Pizzuto was either a principal or an accomplice. The jury convicted without specifying whether it found Pizzuto to have been an accomplice or a principal.

5. Pizzuto's trial lasted thirteen days, over the course of which over twenty witnesses gave testimony.

1438–39 (9th Cir.1995) (holding that the cumulative impact of multiple deficiencies in defense counsel's performance prejudiced the defendant in a capital trial). Taking into account the deficiencies in the case in mitigation, the fact that the evidence available to challenge the state's case in aggravation would not have undermined the double-murder aggravating circumstance does not preclude a finding of prejudice. It is necessary to re-weigh any remaining aggravating circumstance against the mitigating evidence that should have been presented.

B

Failure to Investigate, Argue, or Present Mitigating Evidence

Defense counsel had a duty to investigate, introduce, and explain the significance of available mitigating evidence absent tactical reasons for avoiding such evidence. *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir.2001) (en banc) ("To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' "). While defense counsel presented evidence of Pizzuto's horrific childhood abuse, defense counsel was unconstitutionally deficient in failing to present other available evidence in mitigation. Specifically, defense counsel did not argue the relative culpability of the co-defendants and did not properly investigate Pizzuto's mental health.

*Relative Culpability of Co–Defendants:* The relative culpability of co-defendants is a well-recognized mitigating circumstance. *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir.1996); *Mak v. Blodgett*, 970 F.2d 614, 622–23 (9th Cir.1992), *cert. denied*, 507 U.S. 951, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993). However, defense counsel did not argue the relative culpability of Rice and Odom at sentencing, thus conceding that Pizzuto was the principal of these murders and the most culpable of the three co-defendants. This aspect of defense counsel's ineffectiveness is the same as that discussed above, but from the perspective of mitigation: defense counsel failed to introduce any of the ample evidence that Rice and Odom were not credible witnesses and that they likely were more culpable, and Pizzuto less culpable, than their testimony indicated. As noted above, the jury did not find that Pizzuto was more than an accomplice, and, thus, there certainly was room to argue that he was not actually the principal in these murders. In the end, the trial judge adopted the State's version of the murders based on the testimony of Odom and Rice that Pizzuto was the actual and sole killer, acknowledging Rice and Odom only as Pizzuto's "associates."

As discussed above, defense counsel's failure here cannot be attributed to a reasonable strategic choice. Thus, in this regard, defense counsel's representation "fell below an objective standard of reasonableness ... under prevailing professional norms." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Once again, although the great bulk of the evidence on Rice and Odom's credibility was presented and argued before the trial judge during the guilt phase, the complexity of the case and the time lapse between the conviction and the penalty hearing support a finding of prejudice, especially in light of the trial judge's explicit adoption of the State's version of the murders. *Cf. Williams*, 52 F.3d at 1471. In addition, this deficiency certainly contributes to the overall prejudice caused by all of defense counsel's errors in the penalty phase, as explained in greater detail below.

*Mental Health Investigation:* Defense counsel also was unconstitutionally deficient in failing to request from the court and to consult with an independent psychological expert and in failing to provide the court's mental health expert with the information necessary to make a complete diagnosis. Any contention that a request for an independent expert was made is belied by the record. Although the trial judge referred to a letter dated April 14, 1986, in which defense counsel allegedly requested that they be permitted to hire Dr. Emery to examine Pizzuto for sentencing, this letter is no where in the record, and the letter does not reflect that defense counsel requested an independent expert, only that they requested an expert. Dr. Emery was not an independent expert because he was ordered to report directly to the court.

There simply is no evidence in the record that Pizzuto's defense counsel either objected to the court's order that the expert report directly to the court or insisted on hiring an independent expert. In the absence of such evidence in the record, it is inappropriate to assume that these actions were taken. The majority contends that we may make this assumption, however, because Pizzuto asserted in his petition for rehearing to the Idaho Supreme Court that his defense counsel had requested independent defense experts.[6] What the majority fails to acknowledge is that Pizzuto's defense counsel continued to represent him during these proceedings, although one of his current attorneys also appeared on his behalf on the 1991 brief. The petitioner should not be estopped from arguing that his defense counsel failed to request an independent expert. The record simply does not support the assertion that

such a request was made, and Pizzuto should not be penalized for his defense counsel's failure to acknowledge his deficient representation of Pizzuto at sentencing.

According to the record, defense counsel did not request or consult an independent mental health expert despite the fact that defense counsel was aware that the trial judge considered Pizzuto's mental condition to be a "significant factor" for sentencing. In the end, the only mental health expert utilized by the defense for sentencing was Dr. Emery, the doctor chosen to report to the court.

Dr. Emery's report responded to the questions asked by the court and was furnished directly to the court. The court forwarded copies to the prosecutor and defense counsel. Dr. Emery interviewed Pizzuto for a total of 2.75 hours. His testimony was based on his interview with Pizzuto, interviews of two of Pizzuto's relatives done only the night before he testified, Pizzuto's arrest record, and the defense's case in mitigation and the State's case in aggravation, which he observed prior to testifying.

Dr. Emery testified for both the defense and the prosecution. The court also questioned Dr. Emery. Dr. Emery testified that Pizzuto has an antisocial personality disorder characterized by a preoccupation with justifying himself, a preoccupation with violence, and difficulty anticipating the consequences of his behavior. He testified that Pizzuto is explosive, impulsive, lacks empathy, has little tolerance for ambiguity, and would likely prey on those weaker than he in prison. He also testified that the terrible physical, emotional, and sexual abuse suffered by Pizzuto could be responsible for his antisocial personality

---

**6.** The language used in the brief was as follows: "[T]hough requested by the defense both pre-trial and pre-sentence, not a single independent defense expert was provided." Appellant's 1991 Brief in Support of Pet. for Rehrg. to Idaho S.Ct. at 11–12.

disorder. He opined that Pizzuto's upbringing had "the highest odds to having an offspring that is going to behave in a violent manner," and that neither medication nor therapy would likely help Pizzuto.

Defense counsel acted unreasonably in relying solely on Dr. Emery's evaluation of Pizzuto's mental health. Defense counsel should have consulted an independent psychiatrist who did not report to the court or the prosecutor and with whom the lawyer and the client could discuss matters in confidence. Before Pizzuto's trial began, the Supreme Court held, in *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), that an indigent capital defendant has a right to a psychiatric expert to "assist in the evaluation, preparation, and presentation of the defense" when the defendant's mental condition is significant to the proceeding. In *Smith v. McCormick*, 914 F.2d 1153, 1157 (9th Cir. 1990), we noted that *Ake* rejected the notion that there is such a thing as "neutral" psychiatric testimony, further supporting *Ake's* holding that an indigent capital defendant is entitled to his own psychiatric expert. The *Smith* court concluded that the court's neutral psychiatrist "in no sense assisted in the evaluation or preparation of the defense." *Id.* at 1158.

Although *Smith* was not decided until after Pizzuto's sentencing, the result was already dictated by *Ake*. In addition, the petitioner submits the affidavit of Kathryn Ross, who is qualified as an expert to testify on issues of constitutionally adequate death penalty representation. Ross states that, at the time of Pizzuto's trial, constitutionally effective counsel in a capital case would have been required to request an independent mental health expert if they had reason to believe the client's mental condition might be at issue.[7] In this case, the trial judge made clear that he considered Pizzuto's mental condition to be a significant factor for sentencing. The State has not presented any evidence to rebut Ross's statement. This affidavit, along with the authority of *Ake*, make out, at a minimum, a colorable claim that defense counsel's failure to consult an independent mental health expert was unconstitutionally deficient.

Defense counsel was ineffective in relying on Dr. Emery also because Dr. Emery's examination of Pizzuto was short and incomplete, and he lacked important information that would have influenced his opinion. Defense counsel, although aware of this information, did not inform Dr. Emery that Pizzuto experienced seizures or that he was taking anti-seizure medication, and they did not provide him with Pizzuto's prison records, which indicated that Pizzuto had epilepsy and that his behavior improved over the course of his incarceration. Pizzuto sustained serious head injuries from falling down a flight of stairs at the age of two and from a bicycle accident when he was a teenager. Dr. Emery's affidavit indicates that he was not aware of Pizzuto's seizures or head injuries.

We have held that an attorney has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts

---

7. The majority suggests that this affidavit can be ignored because it does not purport to be based on a review of the record in this case or to express an opinion on defense counsel in this case. It is not clear why that would be necessary when Ross stated that any competent defense attorney, without exception, would have retained an independent mental health expert under the exact circumstances present in this case, that is, when the defendant's mental condition is a significant factor and his life is at stake. There is no valid reason to ignore this evidence.

that the experts do not request ..., at least at the sentencing phase of a capital case." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir.1999).[8] This conclusion is based on the idea that "[a] lawyer who knows of but does not inform his expert witnesses about ... essential pieces of information going to the heart of the case for mitigation does not function as 'counsel' under the Sixth Amendment." *Id.* at 1117 (quoting *Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir.1999)). In *Wallace*, defense counsel was unconstitutionally deficient in failing to provide the mental health expert with the defendant's psychological profiling results and in not informing the expert of the defendant's chaotic family history, including a "clinically significant series of head traumas." *Id.* at 1116. As a result, the experts who testified both for and against the defendant agreed that their diagnoses were incomplete, and that they failed to discover that the defendant likely suffered from organic brain damage.

Similarly, Dr. Emery admits in his affidavit that the omitted facts regarding Pizzuto were significant for the purposes of a complete mental health evaluation and would have caused him to recommend neuropsychological testing prior to trial and sentencing. He states in his affidavit that, "in light of Pizzuto's apparent seizures and abused childhood, which reportedly includes blows to the head," a neuropsychological examination of Pizzuto would have resulted "in a more thorough and complete assessment of Pizzuto's psychological

makeup." Emery Affidavit at 2. Dr. Emery asserts in his affidavit that the evidence indicates that Pizzuto may have temporal lobe seizures, and a neuropsychological examination would have been helpful in detecting such organic brain damage. Pizzuto also submits the affidavit of Dr. Craig Beaver, who was employed after sentencing. Dr. Beaver conducted a more thorough examination of Pizzuto, including 8.5 hours of interviews with Pizzuto, a review of an affidavit of Pizzuto's mother describing his head injuries, a comprehensive neuropsychometric examination, and a review of Pizzuto's prison records. Dr. Beaver's neuropsychometric examination of Pizzuto revealed significant neurocognitive defects consistent with brain injury and seizure disorder.

The findings of Dr. Sarah Werner, who examined Pizzuto on one occasion after he suffered a seizure while in the Idaho penitentiary, do not justify defense counsel's failure to insist on a neuropsychological examination of Pizzuto. The respondent submitted Dr. Werner's affidavit in response to Pizzuto's petition in state court for post-conviction relief. In her affidavit of May 8, 1987, she states that "the probability that Pizzuto is suffering from temporal lobe organic disorder is exceedingly low given the results of the examinations and tests I performed on him."

However, Dr. Werner's opinion of Pizzuto's condition was not stated so clearly in the medical records she wrote when she

---

**8.** This court held in *Murtishaw v. Woodford* that defense counsel is not ineffective for failing to provide a mental health expert with unrequested background information about the defendant for the guilt phase of trial. 255 F.3d 926, 945 (9th Cir.2001). However, the court specifically distinguished existing precedent that held that, to be effective *in the penalty phase* of a capital case, defense counsel must provide background information to mental health experts who are examining the

client, even if the experts do not request those facts. *Id.* at 945, n. 9 (citing *Caro v. Calderon*, 165 F.3d 1223 (9th Cir.1999)). The *Murtishaw* court emphasized, "In this case, Murtishaw does not argue that his experts during the penalty retrial were deprived of potentially relevant information." *Id.* By contrast, here Pizzuto argues that his experts were deprived of relevant information during the penalty phase.

examined Pizzuto. Admitting that it was "almost impossible to extract an adequate history from this patient," she wrote:

> The history given ... certainly [is] consistent with a temporal lobe origin seizure and *it is likely that the patient has had these in the past.* The episodes that he *currently presents* ... could represent temporal lobe status, however the variability and the unusually rapid clearing once out of medical observation and additionally the timing of his symptomatology all strongly suggest that this is a pseudoseizure.

Post–Conviction Relief Record at 47 (emphasis added). At that time, she recommended that he continue to take anti-seizure medication.

Dr. Werner's statements in the medical records differ markedly from her statement submitted for post-conviction relief purposes. Instead of justifying no further investigation, her statement in the medical records should have alerted defense counsel to the possibility of a temporal lobe disorder that could have provided mitigating evidence for sentencing.[9] There is no suggestion that defense counsel contacted Dr. Werner for further explanation or conducted any investigation into these facts at all. Neither could defense counsel have relied on the fact that Dr. Emery did not find a need for neurological examinations because, as discussed above, they failed to give him the information necessary to form an opinion in this regard.

In sum, defense counsel's failure to insist on neuropsychological testing did not stem from an informed decision made after reasonable investigation, as required by the Constitution, but was the product of neglect. *See Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir.1998) (finding ineffective

assistance where defense counsel "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision" regarding his client's mental health defenses); *cf. Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir.1995) (holding that defense counsel gathered sufficient evidence to make a reasonable tactical decision not to conduct further investigations into his client's mental health when psychiatric experts interviewed the defendant for more than twenty hours and informed defense counsel that they could not find any basis for a mental defense).

Pizzuto not only has shown that his counsel's failure to investigate and secure mental health evidence constituted an unconstitutional deficiency, he has also shown that the deficiency prejudiced his capacity to present relevant and compelling mitigation evidence and to counter the State's evidence of aggravation. The bulk of Dr. Emery's testimony led the trial court to find numerous aggravating circumstances, not mitigating circumstances, including the fact that Pizzuto has a low I.Q. At least twelve of the non-statutory aggravating factors listed in the court's findings are based directly on Dr. Emery's testimony at sentencing, often using his exact words.

By relying on an expert who reported directly to the court and the prosecutor and who lacked critical information about Pizzuto's history, the defense left the trial court with only Dr. Emery's negative conclusions. Had defense counsel consulted an independent expert whom he fully informed and who conducted a more comprehensive examination, the expert probably would have provided testimony similar to that contained in Dr. Beaver's affidavit.

---

9. No one questions that Pizzuto had the requisite mental state for a conviction of murder in the first degree. However, the evidence of epilepsy and brain damage is important evidence in mitigation for the purpose of individualized sentencing.

The majority finds little difference between Dr. Beaver's affidavit and Dr. Emery's testimony at the sentencing hearing. I disagree. It is true that the doctors' statements do not directly contradict each other in every regard; after all, they were evaluating the same person. However, Dr. Beaver contributed important mitigating factors that Dr. Emery's testimony did not reach.

Dr. Emery characterized Pizzuto simply as a sociopath; he testified that Pizzuto likes to dominate others, that medications and therapy would not likely help Pizzuto, and that Pizzuto will continue to be dangerous even in prison. The judge, in questioning Dr. Emery, focused on these particular aspects of the doctor's opinion.

Dr. Beaver's affidavit, in contrast, states that "[w]hile Pizzuto does have some antisocial traits, he also struggles with an organic mental syndrome, related to his epilepsy." He explains that Pizzuto exhibits passive dependent features, which, combined with his cognitive and emotional limitations, "make it very unlikely that [he] would be a leader with a group of peers." Dr. Beaver gives us a better understanding of the impact the childhood abuse had on Pizzuto, explaining that patients with brain damage and/or epilepsy are "more vulnerable to their environment and are more adversely affected by negative family and environmental conditions given their more limited resources." This description of his mental condition paints a very different picture of the human being before the

court. These are the kind of "compassionate or mitigating factors stemming from the diverse frailties of humankind that the court must not be precluded from considering in the individualized sentencing required in capital cases". *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

Dr. Beaver also stated: "I do *not* feel Jerry Pizzuto poses a significant risk to others within the prison population. If Pizzuto continues on anti-seizure medication, has the structure of the correctional system, and remains abstinent from drugs or alcohol, I believe he can function safely and adjust appropriately to long-term incarceration." Beaver Affidavit at 8 (emphasis in original). In contrast, Dr. Emery testified that Pizzuto might be safe and productive only in a highly structured setting where supervision would prevent any sort of predator-prey relationship. Upon questioning from the court, he went on to say that the penitentiary system is highly hierarchical, implying that there was not sufficient supervision to prevent Pizzuto from posing a danger to others. His conclusion as to the danger Pizzuto posed in prison was very different from Dr. Beaver's.[10]

As can be seen from this review of the evidence, the epilepsy and possible brain damage suffered by Pizzuto are extremely important in understanding his behavior, in assessing his culpability, and in determining whether medication would be help-

---

10. The majority takes Dr. Beaver's statement that he does not believe Pizzuto poses a significant risk to others in prison out of context to conclude that he agrees with Dr. Emery that Pizzuto poses some risk. However, as the State conceded at oral argument, no doctor would presume to conclude that a prisoner poses no risk at all. They can only speak in terms of probabilities, and Dr. Beaver's assessment of that probability is significantly different from Dr. Emery's.

The majority also suggests that Dr. Beaver's statement is not probative of how Pizzuto would have been assessed by a fully informed, independent mental health expert at the time of trial. Dr. Beaver did not evaluate Pizzuto until 1996, when Pizzuto had reached the age of 40. However, this delay was the direct result of defense counsel's ineffectiveness in failing to obtain and fully inform an independent expert at the time of trial. It cannot be held against Pizzuto at this stage.

ful. By failing to request an independent expert and not giving the court's expert pertinent information, defense counsel lost the opportunity to share this understanding with the court in aid of presenting mitigation. Instead, the court heard overwhelmingly aggravating circumstances that contributed directly to the court's decision to impose the death penalty. This important mental health evidence alters the balance of mitigating and aggravating circumstances and its absence at sentencing significantly undermines confidence in the outcome.

C

Closing Argument

In addition to defense counsels' failures during the rest of the sentencing hearing, defense counsel's brief closing argument was unconstitutionally deficient. The State's closing argument outlined the facts of the crime as the State viewed them, reviewed the testimony of the witnesses in aggravation, emphasized Dr. Emery's conclusion that Pizzuto was dangerous and could not be rehabilitated, referred to the suffering of the surviving family members, and asked for the death penalty. Defense counsel gave a brief closing argument. Other than general pleas for mercy and forgiveness, the defense's closing, reported on three pages, consisted of the following:

> Regardless of the verdict of this jury, does there not linger in your mind some doubt as to the roles of these people in this grizzly event that took place in Ruby Meadows? Is there nothing salvageable about this human being that we can look to after hearing Emery's testimony, that this man is the classic case of sociopath, abusing children? And if you could pick a scenario to point out the worst of all childhood experiences, Jerry Pizzuto would be the man who most demonstrates that. Cannot

there be some thought of forgiveness for that and all of the suffering that he has taken upon his shoulders throughout his childhood and his life? ... He's a victim of the system, he's a victim of his parents, and of course he's a victim of himself.

Defense counsel's closing argument was devoid of substance. He did remind the court of Dr. Emery's testimony that Pizzuto was a classic sociopath! He did not bother to challenge the State. He had at hand available evidence to challenge whether the aggravating circumstances had been proved beyond a reasonable doubt. Instead of summarizing and explaining the impact of the multitude of evidence available showing the lack of credibility and relative culpability of the co-defendants, defense counsel merely suggested that there might be "some doubt" lingering as to the roles of "these people." These omissions highlight his professional incompetence. See Mayfield, 270 F.3d at 928 (finding counsel's "perfunctory" closing deficient in its failure to explain the significance of the mitigating evidence). Worse than omitting important evidence, this "lingering doubt" statement assumed that the jury had decided Pizzuto was the actual killer, and that Rice and Odom were not culpable, despite the general verdict that may have been based on an accomplice theory.

At the beginning of his closing, defense counsel said, "I don't think that a long attempted eloquence will make any difference in this matter, so I'm not going to belabor this court with my conversation." The State claims that this was an acknowledgment of defense counsel's tactical choice to keep the closing short. However, if this was a tactical choice, it was not a reasonable one. Possibly if defense counsel had presented, during the sentencing hearing, the available evidence casting doubt

on the aggravating circumstances and showing mitigating circumstances, he could have refrained from extensive rehashing of evidence. But defense counsel failed, during the hearing, to contest the aggravating factors, argue the unreliability of the prosecution's key witnesses and their relative culpability, and discover and present important mental health evidence. In assessing ineffectiveness claims it "is the totality of [defense counsel's] efforts we must examine, not just part of them in isolation." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir.1997). In the context of an already deficient representation at sentencing, defense counsels' failure to make such arguments at closing left the trial court with little reason to spare Pizzuto's life. In light of the prosecution's detailed and thorough closing, counsel's performance was devastating.

Also, this is not the sort of case where the evidence of the aggravating circumstances was so overwhelming that arguing the mitigating evidence available to the defense or arguing that some of the aggravating circumstances were not established beyond a reasonable doubt would have been "a useless charade." *Id.* at 1043. On this point, our decision in *Smith v. Stewart* is telling. 140 F.3d 1263 (9th Cir.1998). Like the Herndon murders, Smith was convicted of a robbery murder. The underlying crime in *Smith* was roughly similar to this case. Smith was a parolee who committed several armed robberies before shooting a store clerk in cold blood. *Id.* at 1268. Smith's victim died after he "lingered on in pain and fear for a couple of weeks." *Id.* at 1269. Smith offered a "cock-and-bull story" upon his arrest. When he discovered that his story would not hold up, he devised a new defense that the jury did not credit. *Id.* at 1268.

Smith's lawyer failed to investigate or present any mitigating evidence, despite the availability of evidence that Smith had an antisocial personality disorder, a bad drug history, and some close family relationships. *Id.* at 1269. Although this court recognized that these mitigating factors were often treated on appeal as insufficient to justify mitigation, the court could think of no tactical reason for not presenting or at least arguing this evidence. *Id.* Significantly, the court stated, "[W]hile the facts of this case are bad enough to disturb even a jaded observer, they do not reach the level of those in cases where the aggravating facts were so overwhelmingly horrifying that it was highly improbable that mitigating factors of any ordinary stripe would help." *Id.* at 1271. The *Smith* court determined that "the failure to even attempt to persuade the sentencing judge, through evidence or argument, that he should grant Smith leniency" was ineffective. *Id.* at 1269. Equally in Pizzuto's case, the facts were not so extreme that there was no hope for mitigating them such that defense counsels' abandonment of the available evidence was reasonably justified. *See also Mayfield*, 270 F.3d at 929 (holding that Mayfield was prejudiced by his defense counsel's failure to present all the available mitigating evidence although "[t]he aggravating evidence against Mayfield was strong" and "[t]he mitigation evidence presented ... was substantial").

Further, Pizzuto has demonstrated that defense counsels' deficient closing contributed to the cumulative prejudice caused by the other errors at sentencing. Under prevailing case law, individual deficiencies in representation which may not by themselves meet the *Strickland* standard may, when considered cumulatively, constitute sufficient prejudice to justify issuing the writ. *See Harris*, 64 F.3d at 1438–39 (holding that the cumulative impact of multiple deficiencies in defense counsel's performance prejudiced the defendant in a capital trial); *Mak v. Blodgett*, 970 F.2d

614, 622 (9th Cir.1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death.").

To judge cumulative prejudice, we must look at each deficiency in light of the other deficiencies. Since counsel did not present trial evidence in the sentencing hearing, it was unreasonable not to make more explicit reference to the evidence from trial in the closing argument to at least remind the judge that the trial record deserved a closer look for his sentencing determination. Inversely, had defense counsel included specific references to the trial evidence in the closing argument for sentencing, it may have been more reasonable to omit it from the presentation of evidence during the sentencing hearing.

The district court's finding of no prejudice denigrates the importance of advocacy. It assumes that because the trial court heard the testimony at trial, counsel's complete failure to address the evidence at sentencing did not matter. However, the Supreme Court itself, in deciding that defense counsel must be allowed to make a closing argument in a bench trial, recognized that even a two-day interval between evidence and decision might create a situation in which "the judge's memory may well have dimmed, however conscientious a note taker he may have been." *Herring v. New York*, 422 U.S. 853, 864, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). As noted previously, Pizzuto's sentencing hearing occurred nearly two months after the thirteen-day trial.

Finally, the evidence that Pizzuto's defense counsel failed to reargue in the hearing and at closing was significant. It called into question the relative role that Pizzuto played in these murders and the

sequence of events that took place during the murders. These factors were significant in the determination of whether the murders were "heinous, atrocious, and cruel" and whether they exhibited "an utter disregard for human life." This evidence reasonably could have cast enough doubt on the State's version of the murders to tip the balance of the scales in favor of mitigation. A new balance is particularly likely because the trial court was not offered a complete picture of Pizzuto's mental health, which would have revealed more circumstances in mitigation. As a result, defense counsels' overall deficient performance undermines confidence in the outcome of the sentencing.

### D

#### Evidentiary Hearing

Based on the state court record and the affidavits submitted by Pizzuto, he has raised a colorable claim of ineffective assistance of counsel at sentencing. No court has held an evidentiary hearing on Pizzuto's ineffective assistance claims. In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court. *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir.1994). Pizzuto is entitled to an evidentiary hearing on this claim.

We have previously emphasized the importance of evidentiary hearings in capital habeas proceedings. In *Siripongs v. Calderon*, 133 F.3d 732 (9th. Cir.1998) after remanding the case for an evidentiary hearing on the claims of ineffectiveness and receiving the results, the court observed that its decision could now be "made with the confidence that must accompany a decision that upholds a sen-

tence of death." *Id.* at 737. The court explained that often such confidence can only be gained after the petitioner has the opportunity to develop the factual record. *Id.*

Our recent decision in *Hoffman v. Arave* supports the need for an evidentiary hearing on the issue of prejudice in particular. 236 F.3d 523 (9th Cir.2001), *cert. denied, Arave v. Hoffman,* —— U.S. ——, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001). As in Pizzuto's case, no state or federal court had conducted a hearing on Hoffman's allegations of ineffective assistance. In *Hoffman,* the court stated:

> Without the benefit of an evidentiary hearing, it is impossible to evaluate the strength of Hoffman's defense at trial and sentencing. Therefore, we cannot conclude as a matter of law that there is no reasonable possibility that offering expert testimony and a thorough history of Hoffman's educational, medical, and psychological problems at the time of the murder might have reduced the likelihood that the death penalty would have been imposed.

*Id.* at 536. Consequently, the court ordered the district court to hold an evidentiary hearing. *Id.* Also, in *Wallace,* 184 F.3d at 1118, where the defendant alleged ineffective assistance because his counsel did not furnish his mental health experts with pertinent facts, we found that an evidentiary hearing was required to develop the factual record needed to assess prejudice. Thus, a determination that Pizzuto

has not established prejudice is premature on this record. I would remand for an evidentiary hearing.

## II.

### Fifth and Sixth Amendment Rights in Presentence Interviews

Pizzuto's Fifth and Sixth Amendment rights were violated because the trial court used uncounseled, non-Mirandized statements from the presentence interviews against him at sentencing.[11] *Hoffman,* 236 F.3d at 538, 540. I disagree with the majority's conclusion that these constitutional violations were "harmless errors."

In *Hoffman,* after deciding that Hoffman's Sixth Amendment right had been violated by the use of uncounseled statements made in a presentence interview, we remanded the question of whether the violation constituted harmless error. *Id.* at 541. We could not "adequately evaluate the impact of Hoffman's incriminating statements made during the presentence interview without considering the full body of mitigating and aggravating evidence considered at sentencing. Hoffman's allegations of ineffective assistance of counsel at the trial cast doubt over the reliability of this body of evidence." *Id.* at 540–41.

A hearing on ineffectiveness was necessary to determine whether the Sixth Amendment violations were harmless despite the fact that Hoffman took the witness stand during the sentencing hearing

---

11. The use of both the Idaho and Michigan presentence interviews at Pizzuto's 1986 capital sentencing was a constitutional violation under *Hoffman.* As held in *Hoffman,* 236 F.3d at 537, the application of this rule to these interviews is not *Teague* barred; it is not a new rule because the rule was dictated by *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). We decided in *Baumann v. United States,* 692 F.2d 565, 577 (9th Cir.1982), only that the use, *in a non-capital*

*case,* of uncounseled statements made in a presentence interview does not violate the Sixth Amendment. Although the Michigan presentence interview was conducted for a non-capital case, using statements from that interview in Pizzuto's capital sentencing brings it firmly within the purview of *Estelle* and *Hoffman.* I would note that the majority's language to the contrary with respect to the Michigan presentence interview is merely dicta.

and related to the trial court virtually the same information which he disclosed during the presentence interview. *Hoffman v. Arave*, 73 F.Supp.2d 1192, 1205–06 (D.Idaho 1998). Like Hoffman's statements, many of the statements made by Pizzuto in the presentence interviews were introduced to the trial court through other evidence or did not appear to significantly impact the trial judge's decision to impose the death penalty. But, also, like Hoffman, Pizzuto has presented colorable claims of ineffective assistance of counsel at sentencing that require an evidentiary hearing.

Pizzuto's claims of ineffectiveness are similar to Hoffman's. Hoffman's trial counsel apparently failed to obtain or review their client's educational, medical, or psychological records, failed to request a psychiatric evaluation of their client until after the trial despite awareness of his illiteracy, low intelligence, and psychological problems, and failed to follow up on the conclusion of a doctor that Hoffman suffered from possible brain damage. Similarly, Pizzuto claims that his trial counsel failed to investigate or present important mitigating evidence, including possible brain damage, an error that was further exacerbated by the fact that his trial counsel did not attempt to challenge the State's case in aggravation with readily available evidence. Because of these claims, the body of mitigating and aggravating evidence is not reliable in Pizzuto's case. Therefore, as in *Hoffman*, the "harmless error" analysis on his Fifth and Sixth Amendment claims should be remanded to await the evidentiary hearing on the ineffectiveness claim.

## III.

### Constitutionality of Idaho's "Heinous, Atrocious, or Cruel" Aggravating Factor

Idaho's list of statutory aggravating circumstances, at least one of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed, includes a finding that "[t]he murder was especially heinous, atrocious or cruel, manifesting exceptional depravity." The trial judge in Pizzuto's case found that this factor, along with four others, existed beyond a reasonable doubt.[12] The petitioner asserts that this aggravating factor is unconstitutionally vague. The Supreme Court has held that the state must "channel a [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and 'make rationally reviewable the process for imposing a death sentence.'" *Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)). If the statutory language is too vague, then the federal court must determine whether the state courts have further defined the vague terms in a constitutionally sufficient manner. *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The parties agree that the terms "heinous, atrocious, and cruel" and "manifesting exceptional depravity" are too vague to sufficiently guide the sentencer. *Maynard v. Cartwright*, 486 U.S. 356, 360, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (holding that "heinous, atrocious, or cruel" is unconstitutionally vague language); *Godfrey*, 446

12. The five aggravating factors found by the trial judge were: (1) the crime was a double murder, (2) the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity, (3) by the murder, the defendant exhibited an utter disregard for human life, (4) the murder was committed in the perpetration of a robbery and the defendant intended a killing, and (5) the defendant has exhibited a propensity to commit murder.

U.S. at 420–21, 100 S.Ct. 1759 (holding "depravity of mind" to be unconstitutionally vague language); *Moore v. Clarke,* 904 F.2d 1226, 1230 (8th Cir.1990) (holding that "exceptional depravity" is unconstitutionally vague).

The issue in contention is whether the Idaho Supreme Court has provided a limiting construction to guide the sentencer's discretion in a constitutionally sufficient manner. The State argues that the Idaho Supreme Court sufficiently limited the Heinous, Atrocious or Cruel ("HAC") factor by adopting the following interpretation of "exceptional depravity" from Nebraska:

> In interpreting this portion of the statute, the key word is "exceptional." It might be argued that every murder involves depravity. The use of the word "exceptional," however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence.

*State v. Osborn,* 102 Idaho 405, 631 P.2d 187, 200 (1981) (quoting *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881, 891 (1977)), *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158, *reh'g denied,* 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1977). However, the Eighth Circuit has held that Nebraska's use of the word "exceptional" does not provide sufficient guidance. *Moore,* 904 F.2d at 1230–31. It reasoned that "exceptional" is just as subjective and vague as "especially," a term the Supreme Court has rejected as unhelpful in guiding the sentencer. *Id.* at 1230 (citing *Maynard,* 486 U.S. at 364, 108 S.Ct. 1853). This reasoning is persuasive.

The respondent also argues that the Idaho Supreme Court has constitutionally limited the HAC factor by adopting the following interpretation of "heinous, atro-cious, or cruel" from the Florida Supreme Court:

> What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—**the conscienceless and pitiless crime which is unnecessarily torturous to the victim.**

*Osborn,* 631 P.2d at 200 (emphasis added) (quoting *State v. Dixon,* 283 So.2d 1, 9 (Fla.1973)), *cert. denied,* 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The Supreme Court approved of this limiting construction in *Sochor v. Florida,* 504 U.S. 527, 536, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), "understanding the factor, as defined by the Florida Supreme Court, to apply only to a 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.'"

However, Pizzuto contends that the Idaho Supreme Court, in the cases decided after the adoption of this limiting construction, did not specifically find that the HAC homicides were unnecessarily torturous, and the court's formulation of the limiting standard has not been consistent. The Supreme Court addressed a similar claim in *Proffitt v. Florida,* 428 U.S. 242, 255 n. 12, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). The Court reviewed the Florida cases that used the HAC factor after the new construction was adopted. *Id.* The Court found that the circumstances of all of these cases could accurately be characterized as "pitiless" and "unnecessarily torturous," and concluded that the state court had not abandoned the definition it had announced. *Id.* It is necessary to undertake this same type of review with regard to the Idaho Supreme Court's treatment of the HAC factor since the adoption of the "unneces-

sarily torturous" language.[13] Of the seventeen Idaho Supreme Court cases using the HAC factor, possibly five (nearly one-third) involved no suffering on the part of the victim. The murder in *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990), was not "unnecessarily torturous" because the defendant shot his victim with a semi-automatic weapon at close range. In two other cases, the facts of the crime, as recounted by the court, do not suggest that the victims did not die immediately. *See State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989) (the defendant hit his victims on the head with a night stick); *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (1984) (the

defendant hit his eight-month-old victim with severe force). In another two cases, the supreme court did not provide detailed facts of the crime, and, thus, it is not possible to discern whether they support a finding of "unnecessary torture." *See State v. Rhoades*, 121 Idaho 63, 822 P.2d 960 (1991); *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989) (no specific finding of torture or specific facts supporting a finding of torture were included in the opinion in either case). In sum, on the facts deemed critical by the Idaho Supreme Court, only twelve of Idaho's seventeen "heinous, atrocious, or cruel" murders involved torture to the victim,[14] and five did

---

13. The State contends that this type of review is foreclosed by *Arave v. Creech*, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993). In *Creech*, the Supreme Court held that its decisions "do not authorize review of state court cases to determine whether a limiting construction has been applied consistently." *Id.* at 1544. However, the Supreme Court made it explicit that "federal courts may consider state court formulations of a limiting construction to ensure that they are consistent," approving the analysis undertaken in *Proffitt*. *Id.* I do not propose to review whether the limiting construction has been applied consistently, which would involve a comparative analysis of the cases and amount to a proportionality review, as noted in *Walton*, 497 U.S. at 655–56, 110 S.Ct. 3047 (1990). Instead, in line with *Proffitt*, the review I propose looks merely to see whether Idaho's formulation, requiring unnecessary torture, has been consistent.

14. *State v. McKnight*, 135 Idaho 440, 19 P.3d 64 (2000) (upholding, in a non-capital case, the trial court's finding that the murder was "heinous, atrocious, or cruel" because the defendant beat his victim repeatedly with a golf club, causing profuse bleeding, continued to beat the victim with a second golf club, asking his victim if he liked choking on his own blood, and then ran over him with a vehicle at least five times); *State v. Wood*, 132 Idaho 88, 967 P.2d 702 (1998) (the defendant kept his victim captive for over a day, during which time he sexually molested her and then shot her in the head with a rifle); *State v. Porter*, 130 Idaho 772, 948 P.2d 127 (1997)

(holding that there was sufficient evidence to show that the victim suffered before she died based on numerous bruises on her forearms that appeared to be defensive wounds and the large amount of blood found at the scene of the crime indicating that many of the wounds were inflicted before the victim died); *State v. Wells*, 124 Idaho 836, 864 P.2d 1123 (1993) (one victim was struck repeatedly in the head with blows severe enough to shatter his skull, and the other victim was struck from behind with enough force to put a two-inch hole in her skull; both victims were barely alive when the police arrived); *State v. Hoffman*, 123 Idaho 638, 851 P.2d 934 (1993) (the victim spent an entire night knowing she was going to die and then had to beg the co-defendant to finish the job after the defendant had slashed her throat and left her to bleed to death); *State v. Sivak*, 119 Idaho 320, 806 P.2d 413 (1990) (the defendant stabbed his victim several times, shot her several times, and sexually molested her before she died); *State v. Leavitt*, 116 Idaho 285, 775 P.2d 599 (1989) (the victim suffered 15 slash and stab wounds and her sexual organs had been removed); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989) (the defendant shot his ex-wife repeatedly, but she could have been saved had she received medical attention); *State v. Beam*, 115 Idaho 208, 766 P.2d 678 (1988) (the thirteen-year-old victim was raped, her throat slit, and she ultimately was drowned); *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985) (the defendant bound his victim's hands and mouth with duct tape, and the victim was nearly asphyxiated when

not. This record is in stark contrast to the Florida Supreme Court's record reviewed by the Supreme Court in *Proffitt.* In *Proffitt,* the Supreme Court found that the circumstances of all of the Florida cases could have been accurately characterized as "pitiless" and "unnecessarily torturous." *Proffitt,* 428 U.S. at 255 n. 12, 96 S.Ct. 2960.

Given this shaky record and the Idaho Supreme Court's repeated failure to specifically require that the "unnecessarily torturous" standard be met, particularly at the time of Pizzuto's state proceedings, Idaho's interpretation of the HAC factor did not provide sufficient guidance to the sentencer. Thus, this factor remained unconstitutionally vague when Pizzuto's sentence was imposed.

The unconstitutionality of the HAC factor should not be considered harmless error. The trial court found four other aggravating factors that individually outweighed the mitigating factors. However, when the trial court weighed these factors it did not consider various mitigating circumstances that Pizzuto has effectively argued should have been considered. Specifically, the ineffectiveness of Pizzuto's counsel during sentencing and the trial judge's improper use of mitigating circumstances as aggravating (discussed below) skewed the balancing process. *Phillips v. Woodford,* 267 F.3d 966, 985 (9th Cir.2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted."). Because the body of mitigating evidence actually considered by the trial court is unreliable, a reweighing is required, and the unconstitutional HAC factor should be eliminated

to ensure that it does not comprise any part of the balance.

## IV.

### Non-statutory Aggravating Factors

In its sentencing findings, the trial court listed as an aggravating circumstance that Pizzuto "is unintelligent, uneducated, unskilled and totally lacking in discipline and motivation such that he will never be capable of securing or maintaining employment or of being anything other than a counter productive element of society." The trial court's use of these factors as aggravating is invalid and offends the Eighth Amendment. We held in *Beam v. Paskett* that:

> Under the Eighth Amendment, a state may not make application of the death penalty depend upon a particular characteristic of the offense or offender if selection of such a characteristic "makes no measurable contribution to acceptable goals of punishment. ..." Thus, before a state may base its decision to execute a defendant on a defendant's particular characteristics, the state must demonstrate that its reliance on such characteristics serves to further its interest in retribution, in deterrence, or in the elimination of those likely to kill again.

3 F.3d 1301, 1308 (9th Cir.1993) (citations omitted). We held that it was improper to use Beam's non-violent, consensual or involuntary sexual conduct to find that he would be a continuing threat to society. In order to be constitutionally permissible, *Beam* held that the state must "introduce evidence demonstrating a close link between the defendant's sexual history and his future dangerousness." *Id.* at 1309.

the defendant killed him by stabbing him repeatedly); *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985) (the defendant was convicted of murder by torture of a three-year-old child); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983)(the co-defendants beat one victim with a baseball bat and then knocked out their other victim and strangled her).

The court concluded that the state failed to demonstrate this close link. *Id.*

The State suggests that there is a link between Pizzuto's lack of intelligence, education, skills, discipline and motivation and the legitimate penological goal of rehabilitation. However, the State presented no evidence establishing a "close link" between the defendant's characteristics and his ability to be rehabilitated. It is true that these qualities might hinder his ability to gain employment, but the fact that he may end up unemployed does not necessarily mean that he will continue a life of crime, particularly since incarceration is inevitable if he is not executed. Any possible link here is extremely tenuous. The state has failed to show that selecting Pizzuto's low I.Q. and lack of education and skills as reasons to put him to death makes any measurable contribution to acceptable goals of punishment. The trial court violated the Eighth Amendment by relying on these characteristics as aggravating circumstances.

This Eighth Amendment violation is not harmless error because the evidence of Pizzuto's low I.Q. not only should not have been considered aggravating, but it should have been considered mitigating. According to the expert testimony of Dr. Emery, Pizzuto's I.Q. of 72 indicates that he is borderline mentally retarded. Courts have frequently held that borderline mental retardation is an important mitigating factor. *See, e.g., Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Pizzuto was entitled to the opportunity to have this factor be considered mitigating. *See Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that the trier of fact must be allowed to consider and give effect to all relevant mitigating evidence). This opportunity was foreclosed when the trial judge improperly twisted this factor into an aggravating circumstance. The trial judge's treatment of this mitigating evidence was worse than an exclusion, which would have been forbidden.

Because this error affected both sides of the balance, one cannot be sure that the valid aggravating factors would have outweighed all the mitigating evidence, including that which was previously not considered.[15] Based on this violation and the unconstitutionality of the HAC factor, we should vacate the death sentence and remand for resentencing.

V.

Conclusion

Pizzuto's Fifth, Sixth, and Eighth Amendment rights were violated at his capital sentencing, resulting in a punishment of death. Pizzuto's death sentence should be vacated and the case remanded for resentencing because the trial court relied on Idaho's unconstitutional HAC aggravating factor and on unconstitutional, non-statutory aggravating factors that should have been considered mitigating. Even in the absence of these errors, at a minimum, this case should be remanded to the district court for an evidentiary hearing on Pizzuto's ineffective assistance claims and the violation of his Fifth and

---

**15.** Even were we to conclude that the trial judge was not required to consider Pizzuto's borderline mental retardation as mitigating, the constitutional violation inherent in considering it aggravating still would not be harmless. As discussed with regard to the HAC factor above, when the trial court concluded that other aggravating factors individually outweighed the mitigating factors, it did not consider the mitigating circumstances that Pizzuto's ineffective counsel failed to present to the court at sentencing. Under these circumstances, any conclusion on harmlessness should await the evidentiary hearing on Pizzuto's ineffectiveness claims.

Sixth Amendment rights in the use of his uncounseled, non-Mirandized statements made in presentence interviews. I cannot agree that the numerous errors committed at Pizzuto's sentencing were non-prejudicial. I dissent.